UNITED STATE DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BURNS & LEVINSON, LLP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AASHISH KALRA, | ) |
| TRIKONA ADVISERS LIMITED, and | ) |
| ASIA PACIFIC VENTURES LIMITED, | ) Civil Action No.: |
| | ) |
| Defendants, | ) |
| | ) |
| CAMBRIDGE TECHNOLOGY | ) |
| ENTERPRISES, LTD., | ) |
| | ) |
| Reach and Apply Defendant. | ) |
| | ) |

NOTICE OF REMOVAL

TO:    Clerk's Office
       United States District Court
       District of Massachusetts
       One Court House Way
       Boston, MA 02210

       Clerk's Office
       Middlesex Superior Court
       200 Trade Center
       Woburn, MA 01801

       Michael Gilleran, Esq.
       Burns & Levinson, LLP
       125 Summer Street
       Boston, MA 02110-1624

Defendant Aashish Kalra hereby files this Notice of Removal pursuant to 28

U.S.C. §§1332 and 1441. As set forth more fully below, this case is removable because

there is complete diversity of citizenship between plaintiff Burns & Levinson, LLP

1

("Burns & Levinson") and all defendants.  None of the defendants is a citizen of Massachusetts and the amount claimed to be in controversy, $342,368.25, exceeds $75,000.

1.      On or about April 5, 2016 plaintiff Burns & Levinson filed its complaint in the Superior Court Department of the Trial Court of Suffolk County, Commonwealth of Massachusetts titled, *Burns & Levinson, LLP v. Aashish Kalra, Trikona Advisers Limited and Asia Pacific Ventures Limited and Reach and Apply Defendant Cambridge Technology Enterprises, Ltd., Defendants,* Suffolk Civ. No. 1684CV01124B.  *See* Exhibit A.  The papers attached hereto as Exhibits A-D were left at Mr. Kalra's home in Connecticut on April 6, 2016.  It does not appear that any effort has been made to serve the corporate entity defendants.  This Notice of Removal has been filed within 30 days after service of the complaint.  *See* 28 U.S.C. § 1446(b).

2.      There is complete diversity of citizenship between Burns & Levinson, LLP, a limited liability partnership registered in Massachusetts with a principal place of business in Boston, Massachusetts and all defendants.   Mr. Kalra is a citizen of, and resident in, Connecticut.  Upon information and belief, defendant Trikona Advisers Limited is incorporated in, and a citizen of, The Cayman Islands with a principal place of business in Connecticut; and defendant Asia Pacific Ventures Limited is incorporated in Panama with a principal place of business in India.[1]

4.      As the requirements of federal diversity jurisdiction are met, removal is proper under 28 U.S.C. § 1441.

---

[1] While not material to the removal, reach and apply defendant Cambridge Technology Enterprises, Ltd. is an Indian corporation with a principal place of business in India.

5.     Under 28 U.S.C. § 1441(a), venue of the removed action is proper in the Court as the district and division embracing the place where the state court action is pending.

6.     Pursuant to 28 U.S.C. § 1441(a), defendant Mr. Kalra is filing the following documents herewith, and these documents constitute all process, pleadings and orders served upon him: Complaint (Exhibit A); Motion for Ex Parte reach and Apply of Stock via Temporary Restraining Orders and for "Freeze Orders" of General Assets (Exhibit B); Summons (Exhibit C); and Order Allowing Motion for Special Process Server (Exhibit D).

8.     Pursuant to Local Civil Rule 81.1, defendant Mr. Kalra will file in the Court certified copies of all records and proceedings in the state court and a certified copy of all docket entries in the state court within 28 days.

9.     This Notice of Removal is served upon all parties and filed with the Clerk of the Superior Court Department of the Trial Court of Suffolk County, Commonwealth of Massachusetts, contemporaneously with this filing. *See* 28 U.S.C. § 1446(d).

WHERFORE, Mr. Kalra requests this action be removed to this Court, and that the Court grant all further and appropriate relief.

Respectfully submitted,

AASHISH KALRA,

By his attorney,

/s/ Juliet A. Davison
Juliet A. Davison (BBO# 562289)
DAVISON LAW, LLC
280 Summer Street, 5th fl.
Boston, MA  02210
(617) 345-9990
juliet@davisonlawllc.com

Dated:  April 8, 2016

## CERTIFICATE OF SERVICE

I, Juliet A. Davison, hereby certify that on April 8, 2016, I caused a copy of the Notice of Removal to be filed to be served by email and by first class mail upon Michael Gilleran, Esq. (mgilleran@burnslev.com) Burns & Levinson, LLP, 125 Summer Street Boston, MA 02110, counsel for Burns & Levinson, LLP.

/s/ Juliet A. Davison
Juliet A. Davison

Dated:  April 8, 2016

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                       SUPERIOR COURT
                                                   CIVIL ACTION NO. _____

| | |
|---|---|
| BURNS & LEVINSON, LLP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AASHISH KALRA, | ) |
| TRIKONA ADVISERS LIMITED, and | ) |
| ASIA PACIFIC VENTURES LIMITED, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| CAMBRIDGE TECHNOLOGY | ) |
| ENTERPRISES, LTD., | ) |
| | ) |
| Reach and Apply Defendant. | ) |
| | ) |

**RECEIVED**

APR - 5 2016

SUPERIOR COURT-CIVIL
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

## <u>VERIFIED COMPLAINT</u>

### Introduction

Plaintiff Burns & Levinson, LLP hereby complains of Defendant Aashish Kalra, Trikona

Advisers Limited, and Asia Pacific Ventures Limited, in that they have failed to pay substantial

sums for legal services which they sought and which were rendered to them.  Mr. Kalra at all times

promised to pay for legal services rendered to Trikona Advisers Limited, of which he was

indirectly a substantial shareholder, and to Asia Pacific Ventures Limited.  Burns & Levinson

seeks payment for these legal services, as follows: (i) directly from Mr. Kalra, Trikona Advisers

Limited, and Asia Pacific Ventures Limited; (ii) from Mr. Kalra personally who promised to pay

for all legal services rendered to Trikona Advisers Limited and Asia Pacific Ventures Limited; (iii)

by reaching and applying, in satisfaction of all amounts owed, Mr. Kalra's stock in Cambridge

Technology Enterprises, Ltd.; and (iv) by "freeze orders" directed against Mr. Kalra's general

1

assets.  Burns & Levinson also brings claims against Mr. Kalra under G.L. c. 93A and the Connecticut Unfair Trade Practices Act ("CUTPA"), for attorney's fees and multiple damages, in that Mr. Kalra promised Burns & Levinson LLP that he would make payment from certain specific assets of his as he realized on them, but he has not done so.

### Parties

1.      Plaintiff Burns & Levinson LLP ("Burns & Levinson") is a law firm organized as a limited liability partnership with a principal place of business of 125 Summer Street, Boston, County of Suffolk, Massachusetts.

2.      Defendant Trikona Advisers Limited ("Trikona") is a corporation incorporated in the Cayman Islands whose principal place of business is 9 Placid Lake Lane, Westport, Connecticut. Aashish Kalra, described below, whose domicile is 9 Placid Lake Lane, Westport, Connecticut, is an Executive, Director, and the managing and general agent of Trikona.

3.      Defendant Asia Pacific Ventures Limited ("Asia Pacific") is a corporation whose principal place of business is 9 Placid Lake Lane, Westport, Connecticut. Aashish Kalra, described below, whose domicile is 9 Placid Lake Lane, Westport, Connecticut, is an Executive, and the managing and general agent of Asia Pacific.

4.      Reach and Apply Defendant Cambridge Technology Enterprises Ltd. (sometimes referred to herein as "CTE") is a public company incorporated in India.  On information and belief, based on CTE's statements in its "Company History," it has a place of business in Cambridge, Massachusetts.

5.      Defendant Aashish Kalra ("Mr. Kalra") is an individual with a domicile of 9 Placid Lake Lane, Westport, Connecticut. Mr. Kalra is Chairman of CTE, as set forth in a TV-18 interview with Mr. Kalra published on the web site "moneycontrol", a copy of which is attached as Ex. "1".  On information and belief, as indicated on CTE's web site and in its corporate filings, Mr. Kalra is

2

also Chief Executive Officer of CTE. Mr. Kalra, as the Chief Executive Officer and Chairman of the Board of Directors of CTE, is also the managing and general agent of CTE. Mr. Kalra has told Michael Gilleran, his former counsel at Burns & Levinson, that he (Mr. Kalra) is a significant shareholder of CTE.

## Jurisdiction and Venue

6.    This court has personal jurisdiction over the Defendants in this matter under the Massachusetts Long-Arm Statute, G.L. c. 223A, § 3(a) in that they transacted business in the Commonwealth and the causes of action herein arose from that business. In January 2015, Defendant Mr. Kalra and Trikona engaged Burns & Levinson, with its principal place of business in Boston, Massachusetts, to represent them in various law suits when in January 2015 Attorney Michael Gilleran, formerly at the Boston firm of Adler Pollock & Sheehan (Adler Pollock), moved to Burns & Levinson. Mr. Kalra, on January 9, 2015, on behalf of himself and Trikona signed a Client Transfer Authorization Form, a copy of which his attached as Exhibit "2", requesting and authorizing that all electronic and hard copy client files for their litigation matters (described more fully below) be moved from Adler Pollock to Burns & Levinson. Mr. Kalra emailed the Client Transfer Authorization Form to recipients in Massachusetts.

7.    Over the course of the next eleven months, while Mr. Gilleran and Burns & Levinson represented Mr, Kalra, Trikona, and Asia Pacific, Mr. Kalra sent hundreds of emails to Attorney Gilleran at his web address at Burns & Levinson in Boston, Massachusetts. During the same time period, Mr. Kalra made hundreds of telephone calls to Mr. Gilleran at his direct dial phone at Burns & Levinson in Boston, Massachusetts, and to Attorney Gilleran's mobile phone while he (Attorney Gilleran) was either at Burns & Levinson in Boston or at home in a Boston suburb. Mr. Kalra and Attorney Gilleran consulted virtually daily, and sometimes many times in a single day, about the direction of the various pending litigation matters.

8.      Beginning on March 5, 2015, Burns & Levinson sent invoices for its legal services from its principal place of business in Boston, Massachusetts, to Mr. Kalra in Connecticut, a summary of which are set forth on a Statement of Account, a copy of which is attached as Exhibit "3". Many times Mr. Kalra promised to Attorney Gilleran to pay the invoices from his personal resources. Mr. Kalra made the same promise to the management of Burns & Levinson. Mr. Kalra never voiced any objection to the invoices.

9.      This court also has personal jurisdiction over the Defendant Mr. Kalra in this matter under the G.L. c. 93A, in that Mr. Kalra many times made promises (as more fully set forth below) to Mr. Gilleran in Massachusetts in which Mr. Kalra stated that he would pay the invoices as he realized on designated and specific assets of his, and he failed to do so, and therefore the complained of acts and practices took place primarily and substantially in Massachusetts.

10.     This court also has jurisdiction over CTE, although it is a nominal reach and apply defendant, in that, based on information and belief (as set forth above), it has a place of business in Massachusetts. Also, based on information and belief, CTE has transacted business in Massachusetts and the causes of action have arisen from that business.

11.     Venue is proper in this Court because Plaintiff Burns & Levinson has its principal place of business at 125 Summer Street, Boston, County of Suffolk, Massachusetts.

**Facts Common to All Counts**

12.     According to the first paragraph of Mr. Kalra's entry on Wikipedia, a full copy of which is attached at Ex. "4":

**Aashish Kalra** (*also known as Ashish Kalra*) is a business professional and a pioneering equity investor in technology, infrastructure, real estate, energy, logistics and hospitality. Aashish currently serves as chairman of Cambridge Technology Enterprises[1] and Cambridge Innovations, an investor and technology partner to early stage companies leveraging technologies in the area of cloud and big data for disruption.[2] Since his appointment, Aashish has been credited for transforming the company as a sophisticated technology platform focused on the convergence of Cloud and Big Data and working with selective Fortune 500 companies– a move that has seen the company's stock price

4

rise by over 1800%[2] and double its revenue in 1 year.[4] Prior to Cambridge Technology Enterprises, he was the Founder and Managing Director of Trikona Capital, where he deployed US $1 billion[3] in Indian infrastructure development and created value of approximately US $10 Billion.[6] He is a socially conscious investor[7][8] and often lent support to new companies with finance, strategic recruitment, planning and partnerships, whilst also serving on their board of directors. Aashish has been often quoted[9] in leading Indian & international media and was featured in the "Young Turks" program on CNBC.[10][11] Having led Cambridge Technology Enterprises to numerous milestones, Aashish has been interviewed a number of times by India's leading business media. Following recent success with Cambridge Technology Enterprises and launching Cambridge Innovations –he was featured on CNBC-TV18[12] and Bloomberg TV India.[13] Aashish Kalra was also featured on TV5 (India) where he shared his thoughts on a healthy forecast for Cambridge Technology Enterprises[14] and with Bloomberg TV India where he spoke about his plans for the company's growth.[4] He has also written a number of industry articles, most recently on *"Is big data a sound investment?"*, published on [India Infoline][15] and was also recently quoted on *"How a blend of technology and human touch can help HR to manage their quantitative information and 'human capital' more effectively"*.[16]

13.    In 2006 Mr. Kalra was a co-founder, along with Mr. Rakshitt Chugh, who resides in New Canaan, Connecticut, of Trikona, which they incorporated in the Cayman Islands. Trikona became a highly successful investment manager and adviser with a focus on investments in India.  Mr. Kalra and Mr. Chugh were each co-chief executives and directors of Trikona.  By 2008 Trikona had over $1 billion under management and was earning very high rates of return for its investors.  Mr. Chugh was paid very large sums by Trikona, which he assigned to his nominee shareholders of Trikona, namely Haida Investments Ltd. and ARC Holdings LLC.

14.    Despite the success of Trikona, a dispute developed between Mr. Kalra and Mr. Chugh because of Mr. Kalra's belief that Mr. Chugh was attempting to appropriate for himself Trikona's business, investors and employees, including its customer relationship management database.  Mr. Chugh's new companies, to which he tried to transfer Trikona's business, were known as the Peak XV companies.

15.    In 2011, Mr. Kalra approached Attorney Michael Gilleran while he was at the Boston law firm of Adler, Pollock & Sheehan, P.C., about bringing suit against Mr. Chugh, his nominee shareholders of Trikona, and the Peak XV companies.  Attorney Gilleran had

significant experience in international litigation, claims of unfair and deceptive trade practices, and use of prejudgment security devices, having previously written articles on many of these subjects.

16.     In late 2011, Attorney Gilleran and Adler Pollock filed suit, first on behalf of Asia Pacific and then Trikona, in the United States District Court for the District of Connecticut, Civil Docket Number 3:11-cv-02015 against Rakshitt Chugh, one of the nominee shareholders, namely, ARC Capital LLC, and the Peak XV companies (the "Trikona v. ARC Action"). Trikona sought to recover, among other things, all of the lost value in Trikona, which Mr. Kalra placed in the range of $750 million. Shortly after the Trikona v. ARC Action was filed against Mr. Chugh, ARC and the Peak XV companies, the board of directors of Trikona voted to expel Mr. Chugh as a board member.

17.     In late February 2012, Attorney Gilleran and Adler Pollock filed a related action on behalf of Trikona in Connecticut Superior Court in Hartford, Connecticut, Docket No. HHD-CV12-6030347-S, against Mr. Chugh, and his other nominee shareholder of Trikona, namely, Haida Investments Ltd. (the "Trikona v. Haida Action").  In the Trikona v. Haida Action, Trikona sought to recover from Haida the same $750 million in lost value of Trikona, and also $10 million in compensation from Trikona that Mr. Chugh had directed to Haida.

18.     In response to the Trikona v. ARC Action and the Trikona v. Haida Action, Mr. Chugh, ARC, and Haida, commenced an action against Trikona in the jurisdiction where Trikona was incorporated, that is, the Cayman Islands (the "Cayman Action").  The nature of Cayman Action was that ARC and Haida, as Mr. Chugh's nominee shareholders in Trikona, sought to wind-up or liquidate Trikona on the ground that they were under the law of the Cayman Islands "quasi-partners" in Trikona with Mr. Kalra's nominee shareholder, Asia Pacific, and Mr. Chugh's expulsion from Trikona's board of directors was "oppressive".   Although Attorney

Gilleran did not file an appearance in the Cayman Action (not being an admitted lawyer in that jurisdiction) he acted to provide information about the Trikona v. ARC Action and the Trikona v. Haida Action to Cayman counsel in the defense of the Cayman Action.

19.     In August 2012, Trikona, represented by Attorney Gilleran and Adler Pollock filed in U.S. District Court for the Eastern District of New York, Docket No. 12-CV-3886-JBW, an action against the former Trikona employee, and later employee of the Peak XV companies, Kai-Lin Chuang, who allegedly helped Mr. Chugh and the Peak XV companies misappropriate Trikona's investor relationship management database (the "Trikona v. Chuang Action").

20.     Also, in August 2012 and again in early January 2013, Mr. Chugh, along with one or more combinations of ARC and the Peak XV companies, brought two more actions in New York Supreme Court (trial court) against either Mr. Kalra or Trikona, with Index Nos. respectively of 652931/2012 and 650007/2013 (the "New York Actions"). In these New York Actions, Mr. Chugh and his plaintiffs sought to bring breach of fiduciary duty claims or abuse of process claims against Mr. Kalra and another Trikona director. Attorney Gilleran and Adler Pollock defended Mr. Kalra and Trikona in the New York Actions and got them both dismissed.

21.     Also, in September 2013, Haida and ARC sought as part of the Cayman Action to sell the stock of Asia Pacific in Trikona so as to gain control of Trikona and end the Trikona v. ARC Action and Trikona v. Haida Action against them in the United States. In response, Attorney Gilleran and Adler Pollock in October 2013 commenced in the Connecticut Superior Court an interpleader action interpleading the stock of Asia Pacific among the competing claims of Asia Pacific, Vera Financial (Asia Pacific's lender and creditor), Haida, and ARC (the "Asia Pacific Interpleader Action"). This interpleader was allowed. Following the allowance, ARC and Haida appealed, which appeal was eventually taken up by the Supreme Court of Connecticut.

22.     Also, in January 2014, Mr. Chugh, along with ARC Capital, filed an action in Connecticut Superior Court against Mr. Kalra and Trikona, Docket No. HHC-CV-14-6047993-S (the "Chugh v. Kalra Action").  In the Chugh v. Kalra Action, Mr. Chugh asserted, among other things, that in spite of the fact the Trikona was a corporation governed by a board of directors subject to written corporate by-laws it was, instead, subject to a non-written implied partnership between himself and Mr. Kalra.  Attorney Gilleran and Adler Pollock filed appearances on behalf of Mr. Kala and Trikona in the Chugh v. Kalra Action and proceeded to defend them in that action.

23.     Attorney Gilleran and Adler Pollock rendered monthly invoices to Mr. Kalra, Trikona, and Asia Pacific, for these legal services.  Initially Mr. Kalra paid these invoices from the resources of Trikona, but after about September 2012 he paid them solely from his own resources although his resources were held in the name of his own nominee shareholder in Trikona, namely, Asia Pacific.

24.     When Attorney Gilleran moved from the Adler Pollock firm to Burns & Levinson in January 2015, the following litigations involving Mr. Kalra, Trikona, and Asia Pacific, were pending: (i) the Trikona v. ARC Action (and its appeal in the U.S. Second Circuit Court of Appeals); (ii) the Trikona v. Haida Action; (iii) the Asia Pacific Interpleader Action (and its appeal to the Connecticut Supreme Court); (iv) the Trikona v. Chuang Action; and (v) the Chugh v. Kalra Action (collectively, the "2015 Pending Litigations").  Also, at the time of the move there were pending several non-litigation matters: (i) negotiation and documentation concerning a possible purchase of assets of Trikona arising from an ostensible sale of such assets in the Cayman Action; and (ii) information provided for related litigation in India, Mauritius and the United Kingdom (collectively, "2015 Related Services").

25.     In January 2015, Mr. Kalra requested that Burns & Levinson, and Attorney Gilleran as a new partner at Burns & Levinson, take over representation of all of the 2015 Pending Litigations and 2015 Related Services. Mr. Kalra and Attorney Gilleran discussed, and Mr. Kalra agreed, that Burns & Levinson would render monthly invoices to him for legal services and expenses and that those invoices were to be paid in the regular course. As noted above, Mr. Kalra, on January 9, 2015, on behalf of himself, Trikona, and Asia Pacific, signed a Client Transfer Authorization Form (Ex. "2" hereto), authorizing and requiring that all electronic and hard copy client files for their litigation matters be moved from Adler Pollock to Burns & Levinson.

26.     Burns & Levinson at all times expected to be paid for its legal services rendered to Mr. Kalra, Trikona and Asia Pacific. Burns & Levinson sent Mr. Kalra invoices for it services to which he never offered any objection whatsoever. Burns & Levinson many times asked Mr. Kalra for payment. Mr. Kalra many times promised Burns & Levinson he would pay for all legal services rendered from his own personal financial resources.

27.     As set forth above, Mr. Kalra at all times knew of Burns & Levinson's expectation that it would be paid for its legal services. Also, Mr. Kalra had many times engaged professional legal counsel in litigation or arbitration matters in the United States, the United Kingdom, the Cayman Islands, India, Mauritius, and Singapore, and was well aware of the expectation of professional legal counsel to be paid for their legal services rendered.

28.     As set forth in part above, Mr. Kalra was part of the day-to-day decision-making regarding which legal services Burns & Levinson was to perform, and also in what manner they were to be performed, in connection the 2015 Pending Litigations and 2015 Related Services. Again, in 2015 Mr. Kalra communicated usually daily, and often many times in the same day,

with Attorney Gilleran.   These communications took the form of hundreds of emails and hundreds of telephone calls.

29.    Mr. Kalra represented many times to Mr. Gilleran that he (Mr. Kalra) stood behind payment not only of legal work done directly for him, but also of legal work done for Trikona (through Asia Pacific, Mr. Kalra was a 50% owner of Trikona), and Asia Pacific itself. Mr. Kalra also promised to Attorney Gilleran many times that he would pay all of Burns & Levinson's invoices from his own personal resources.   These personal resources included: (i) Mr. Kalra's arbitration judgment for approximately 14 Crore (IND 14 Crore Rupees is worth approximately USD $2.1 million) against a company in India known as Sankalp Buildwell Private Limited ("Sankalp"), a copy of which arbitration judgment is attached as Ex. "5" (the judgment amount of approximately 14 Crore is set forth in the 5th paragraph), which company held in excess of $4 million in bank accounts in India; (ii) his alleged ownership rights in Sankalp and therefore in all of the funds in its bank accounts; (iii) his shareholding in a solar facility in India that he was in the process of selling; and (iv) his ownership interest in funds in a Cyprus bank that had been frozen during a financial crisis in Cyprus.   Mr. Kalra also made these same promises to the management of Burns & Levinson.   Burns & Levinson relied on these promises in continuing to perform legal services for Mr. Kalra, Trikona and Asia Pacific that it would not have continued rendering absent these promises.

30.    For the work of Attorney Gilleran and Burns & Levinson in the 2015 Pending Litigations and 2015 Related Services, Burns & Levinson rendered regular invoices to Mr. Kalra, Trikona, and Asia Pacific, as summarized on the Statement of Account, a copy of which is attached as Ex. "3" hereto.   The total amount of these invoices comes to $342,368.25.   Mr. Kalra never made any objections to the invoices in any way: not as to the work performed, the hourly rates, or the total hours incurred.

10

31.     As shown on the invoices, Attorney Gilleran and Burns & Levinson expended substantial time and resources on the 2015 Pending Litigations and 2015 Related Services, including total hours of all counsel at Burns & Levinson of 813.67, at an average hourly rate of $410.88.     Such an average hourly rate is reasonable given typical hourly rates for other similarly-qualified lawyers in the Boston area. See M. Born, et al, *Damages, Interest and Attorney's Fees*, § 15.7.4 (MCLE 2009 Ed. and 2012 Supp.) and, M. Gilleran, *Massachusetts Practice: The Law of Chapter 93A*, § 11.18 (2007 Ed. and 2015 Supp.) (hourly rates for comparable Boston-based counsel of between $475 to $600 per hour).   Such an amount of work and hourly rate is also reasonable given the work requested by Mr. Kalra, the volume and complexity of the work required by the circumstances, and Attorney Gilleran's role as a senior trial lawyer with substantial recognition and leading publications.

32.     As also shown on the invoices, in connection with the 2015 Pending Litigations and 2015 Related Services, Attorney Gilleran and Burns & Levinson undertook, among other services, the following actions and achieved the following results:

Trikona v. Chuang Action – Filed an opposition to summary judgment and defeated Chuang's motion for summary judgment;

Asia Pacific Interpleader Action – Briefed and argued before the Connecticut Supreme Court, resulting in a completely favorable written decision by the Supreme Court of Connecticut on September 1, 2015. *Trikona Advisers Limited v. Haida Investments Limited, et al*, 318 Conn. 476 (2015), with a copy attached as Ex. "6";

Trikona v. Haida Action - Briefed and filed an extensive motion for default against Chugh and Haida for fraud on the court;

Chugh v. Kalra Action – Defended motions for attachment of Kalra's assets and an injunction against proceeds from pending Indian litigation;

11

<u>Negotiations to buy Trikona Assets</u> – Negotiated terms with the Cayman Joint Official Liquidators in the Cayman Action for possible purchase of some of the assets of Trikona.

33.    Mr. Kalra first breached his agreement to pay for the services of Burns & Levinson when he failed to pay for the first invoice rendered on March 5, 2015 (part of Ex. "3" hereto), which breach took place on April 4, 2015, thirty days after that first invoice was rendered.  By June 1, 2015, Mr. Kalra had not made any payment on any of the invoices of Burns & Levinson, and so Attorney Gilleran on behalf of Burns & Levinson, sent a letter to Mr. Kalra, Trikona, and Asia Pacific, a copy of which is attached as Ex. "7".  In that letter, Attorney Gilleran said that Burns & Levinson would begin filing motions for withdrawal in all of the 2015 Pending Litigations unless payment in full of all invoices rendered to date was received by June 22, 2015.

34.    By the summer of 2015 Mr. Kalra had begun to receive funds from the sources he had said earlier he would use to pay the invoices of Burns & Levinson.  First, he began to receive significant tranches of funds from his unfrozen accounts in Cyprus banks.  Second, on information and belief, he received funds from the sale of his part ownership in a solar facility. Mr. Kalra did not use any of these funds or assets to pay the invoices of Burns & Levinson, in spite of his earlier promises to do so.  Also, as set forth in detail below, his ownership interest in CTE had increased by at least as much as $3 million, yet Mr. Kalra did not realize on this asset in any part to make any payment to Burns & Levinson.

35.    On or around June 22, 2015, Attorney Gilleran and Burns & Levinson began filing motions to withdraw as counsel in the 2015 Pending Litigations.  First, Attorney Gilleran and Burns & Levinson filed a motion to withdraw as counsel in the appeal of the Trikona v. ARC Action in the U.S. Second Circuit Court of Appeals.  This motion for withdrawal was allowed on October 6, 2015.

36.     Second, Burns & Levinson filed a motion to withdraw in the Trikona v. Chuang Action, which was allowed on October 26, 2015.

37.     Third, Attorney Gilleran and Burns & Levinson filed on July 27, 2015 a motion to withdraw in the Trikona v. Haida Action in Connecticut Superior Court. Fourth, Attorney Gilleran and Burns & Levinson filed on September 23, 2015 a motion to withdraw in the Chugh v. Kalra Action also in Connecticut Superior Court. At a hearing in the Connecticut Superior Court in September 2015, before Judge Grant Miller, presiding over both actions, he indicated he would allow both motions to withdraw. At a further hearing on February 19, 2016, Judge Miller again indicated that he would allow both motions to withdraw, but also ordered stays in the cases for 90 days.

### COUNT I:
### Defendants Kalra, Trikona, and Asia Pacific – Breach of Agreement for Legal Services

38.     Plaintiff Burns & Levinson realleges all previous allegations.

39.     Defendants Mr. Kalra, Trikona, and Asia Pacific, requested legal services from Burns & Levinson in connection with the 2015 Pending Litigations and 2015 Related Services.

40.     Burns & Levinson agreed to provide such legal services and did provide such legal services. Also, Burns & Levinson has performed all conditions necessary to payment under the agreement.

41.     Defendants Mr. Kalra, Trikona, and Asia Pacific, have failed, after multiple demands, to make payment for such legal services as required under the agreement and have thereby breached the agreement.

42.     As a result of the foregoing, Plaintiff Burns & Levinson has been damaged.

### COUNT II:
### Defendants Kalra, Trikona, and Asia Pacific – Quantum Meruit

43.     Plaintiff Burns & Levinson realleges all previous allegations.

13

44.   Burns & Levinson has provided valuable legal services to Defendants Mr. Kalra, Trikona, and Asia Pacific, in connection with the 2015 Pending Litigations and 2015 Related Services, for which it reasonably expected to be paid.

45.   Defendants Mr. Kalra, Trikona, and Asia Pacific, accepted the benefits of Burns & Levinson's legal services with the knowledge, actual or chargeable, of Burns & Levinson's reasonable expectation of payment for such services.

46.   In equity and good conscience Defendants Mr. Kalra, Trikona, and Asia Pacific, should not be allowed to retain the benefit they have received from Burns & Levinson and should be required to repay that benefit.

47.   As a result of the foregoing, Plaintiff Burns & Levinson has been damaged.

## COUNT III:
### Defendants Kalra, Trikona, and Asia Pacific – Quasi Contract/Unjust Enrichment

48.   Plaintiff Burns & Levinson realleges all previous allegations.

49.   Burns & Levinson has provided valuable legal services to Defendants Mr. Kalra, Trikona, and Asia Pacific, in connection with the 2015 Pending Litigations and 2015 Related Services, for which it reasonably expected to be paid.

50.   Defendants Mr. Kalra, Trikona, and Asia Pacific, accepted the benefits of Burns & Levinson's legal services with the knowledge, actual or chargeable, of Burns & Levinson's reasonable expectation of payment for such services.

51.   In equity and good conscience Defendants Mr. Kalra, Trikona, and Asia Pacific, should not be allowed to retain the benefit they have received from Burns & Levinson and should be required to repay that benefit.

52.   As a result of the foregoing, Plaintiff Burns & Levinson has been damaged.

## COUNT IV:
### Defendant Kalra – Violation of Chapter 93A

53.     Plaintiff Burns & Levinson realleges all previous allegations.

54.     Mr. Kalra, in his engagement of Burns & Levinson to provide legal services in connection with the 2015 Pending Litigations and 2015 Related Services, was engaged in "trade and commerce" as that term is defined in G.L. c. 93A.

55.     As set forth above, Mr. Kalra made specific and detailed promises to Attorney Gilleran and Burns & Levinson that he would pay for the legal services rendered as he realized on specific and designated assets of his, but he has not done so.

56.     Mr. Kalra's failure to pay for the services, as he promised, from specific and designated assets of his, is an unfair act or practice in violation of Chapter 93A. Such violations of Chapter 93A have taken place primarily and substantially in the Commonwealth.

57.     As a result of the foregoing, Plaintiff Burns & Levinson has been damaged.

## COUNT V:
### Defendant Kalra – Violation of CUTPA

58.     Plaintiff Burns & Levinson realleges all previous allegations.

59.     Mr. Kalra, in his engagement of Burns & Levinson with the 2015 Pending Litigations and 2015 Related Services, was engaged in "trade and commerce" as that term is defined in CUTPA, Conn. Gen. Stat. § 42-110a, et seq., the Connecticut cognate of Massachusetts Chapter 93A.

60.     As set forth above, Mr. Kalra made specific and detailed promises to Attorney Gilleran and Burns & Levinson that he would pay for the legal services rendered as he realized on specific and designated assets of his, but he has not done so.

61.     Mr. Kalra's failure to pay for the services, as he promised, from specific and designated assets of his, is an unfair act or practice in violation of CUTPA.

62.     As a result of the foregoing, Plaintiff Burns & Levinson has been damaged.

## COUNT VI:
### Defendant Kalra/Cambridge Technology Enterprises - Reach & Apply

63.     Plaintiff Burns & Levinson realleges all previous allegations.

64.     As set forth above, Mr. Kalra holds a substantial stock ownership in Reach and Apply Defendant Cambridge Technology Enterprises.

65.     As such, under G.L. c. 214, § 3(6) (the "Reach and Apply Act"), Burns & Levinson is entitled to treat Cambridge Technology Enterprises as a Reach and Apply Defendant in this matter and to use legal process to recover Mr. Kalra's stock in Cambridge Technology Enterprises and liquidate it as a source payment for amounts owed by Mr. Kalra to Burns & Levinson.

66.     As a result of the foregoing, Reach and Apply Defendant Cambridge Technology Enterprises is liable to Plaintiff Burns & Levinson to turnover Mr. Kalra's stock in CTE to Burns & Levinson with a value sufficient to satisfy Burns & Levinson's expected judgment against Mr. Kalra.

### Damages Sought On Prejudgment Reach & Apply

67.     On prejudgment reach and apply, Burns & Levinson seeks security in the amount of $489,265.00, including: (i) its actual damages of $342,368.25 in legal services owed but not paid, as set forth above; (ii) prejudgment interest of $71,897.00 on the principal owed, at the rate of 12% per annum from the date of breach of April 4, 2015, as set forth above, until likely payment nine months from now, that is, January 1, 2017, as provided for contract breaches by G.L. c. 231, § 6C; and (iii) its likely legal fees in this matter of $75,000.00, to be incurred between now and likely payment in this matter nine months from now, as provided for under both G.L. c. 93A and the Connecticut equivalent, known as CUTPA, Conn. Gen. Stat. §42-110a, et seq., as further set forth in Burns & Levinson's accompanying memorandum in support of reach and apply.

**Defendants Have No Insurance to Cover Claims**

68.     Burns & Levinson does not believe that the Defendants have any liability insurance to cover these claims, which sound in breach of contract and intentional tort, because Defendants have never indicated that they have any such insurance and such insurance is unlikely to be commercially available.

**Grounds for Ex Parte Relief**

69.     Since the allowance on October 26, 2015 of the motion of Attorney Gilleran and Burns & Levinson to be discharged as counsel in the Trikona v. Chuang Action, Mr. Kalra has had very little contact with Attorney Gilleran, has not responded to requests for payment, and has made no effort to inform Attorney Gilleran and/or Burns & Levinson of when - or whether - payment will be made.  By this conduct, it appears as if Mr. Kalra intends to resist, or at least to avoid, paying Burns & Levinson.

70.     On November 19, 2015, the General Counsel of Burns & Levinson, Jeffrey Martin, sent a request to Mr. Kalra for payment of the outstanding balances owed to Burns & Levinson, a copy of which is attached as Ex. "8".  Mr. Kalra neither made a response to the request in any way, nor did he make any payment.

71.     Over the past year or so, Mr. Kalra's efforts with CTE appear to have been a huge success, yet he has made no effort to use this success to pay Burns & Levinson.  As shown by an entry for CTE on the "moneycontrol" web site, a copy of which is attached as Ex. "9" (see second page of Ex. "9"maur), the total market capitalization of CTE is approximately 239.50 IND Crore (which is approximately $35 million USD).  According to a press statement made by Mr. Kalra, a copy of which is attached as Ex. "1", the stock price of CTE has increased by 1800% over the last year or so (which of course would include Mr. Kalra's own stock in CTE).   In spite of this huge

17

increase in the value of his stock holdings in CTE, Mr. Kalra has not responded to Burns & Levinson's invoices, its requests for payment, nor suggested any arrangement for payment.

72.     Based on the foregoing, Burns & Levinson believes that there is a clear danger that if Mr. Kalra is notified in advance of the effort to reach and apply his stock in reach and apply defendant CTE, he will withdraw the stock from the control and possession of CTE, before any reach and apply orders can be issued.

73.     Based on the foregoing, Burns & Levinson believes that there is a clear danger that unless Mr. Kalra is enjoined from transferring or otherwise disposing of his stock in reach and apply defendant CTE by a temporary restraining order and preliminary injunction, that Mr. Kalra will transfer or dispose of such stock prior to any judgment issuing in favor of Burns & Levinson, and therefore such stock will become unavailable to satisfy any such judgment.

### Request for Relief

WHEREFORE, Plaintiff Burns & Levinson prays this Court for the following relief:

(1)     Order that a temporary restraining order issue against Aashish Kalra enjoining and restraining him from selling, assigning, pledging, mortgaging, hypothecating or otherwise disposing of any of his assets, whether owned directly or indirectly, or as title holder or beneficiary, other than in the ordinary course;

(2)     Order that a temporary restraining order issue against Aashish Kalra enjoining and restraining him from selling, assigning, pledging, mortgaging, hypothecating or otherwise disposing of his assets, whether owned directly or indirectly, or as title holder or beneficiary, with a value in excess of Ten Thousand Dollars ($10,000.00);

(3)     Order that a temporary restraining order issue against Aashish Kalra enjoining and restraining him from selling, assigning, pledging, mortgaging, hypothecating or otherwise

disposing of his interest in any way of stock, whether held directly or indirectly, or as title holder or beneficiary, in Reach and Apply Defendant Cambridge Technology Enterprises;

(4)     Order that a temporary restraining order issue against Reach and Apply Defendant Cambridge Technology Enterprises enjoining and restraining it from permitting Aashish Kalra to register in any manner any transfer or disposition in any way of Mr. Kalra's interest in stock, whether held directly or indirectly, or as title holder or beneficiary, in Reach and Apply Defendant Cambridge Technology Enterprises;

(5)     Order that Aashish Kalra turn over forthwith his shares in Reach and Apply Defendant Cambridge Technology Enterprises with a value of at least $489,265.00, with the shares to be held pending a further order of this Court;

(6)     Order that all the foregoing temporary restraining orders, after notice, be continued and extended into preliminary injunctions;

(7)     Award, on Counts I-III, judgment to Plaintiff Burns & Levinson and against Defendants Aashish Kalra, Trikona Advisers Limited, and Asia Pacific Ventures Limited, in the amount of $ 342,368.25, plus prejudgment interest from date of breach of April 4, 2015, plus costs of suit herein;

(8)     Award, on Counts IV-V, judgment to Plaintiff Burns & Levinson and against Defendants Aashish Kalra, Trikona Advisers Limited, and Asia Pacific Ventures Limited, in the amount of actual damages of $ 342,368.25, plus triple damages, plus attorney's fees, plus prejudgment interest from date of breach of April 4, 2015, plus costs of suit herein;

(9)     Award, on Count VI, judgment to Plaintiff Burns & Levinson and against Reach and Apply Defendant Cambridge Technology Enterprises permitting Burns & Levinson to reach and apply Aashish Kalra's stock in Reach and Apply Defendant Cambridge Technology in satisfaction of amounts owed to Burns & Levinson; and

19

(10)    Award such other and further relief to Burns & Levinson as this Court deems just and equitable.

Respectfully submitted

BURNS & LEVINSON, LLP
By its attorneys,

Jeffrey Martin (BBO No. 322520)
jmartin@burnslev.com
Michael Gilleran (BBO No. 192210)
mgilleran@burnslev.com
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
T: 617.345.3270
F: 617.345.3299

Dated: April 5, 2016

## VERIFICATION

Michael Gilleran hereby verifies of his own personal knowledge that the foregoing is true, except where stated that he believes the foregoing is true, in which case he believes the foregoing is true based on information and belief.

Signed under the penalties of perjury.

Michael Gilleran

Dated: April 5, 2016

**Exhibit "1"**



Language ▾   App ▾   Subscriptions ▾   Specials ▾   Sign-In   Register          Search Quotes News NAVs          Quotes

**moneycontrol**
India's No.1 Financial Portal

Education refinance customers have saved an average of $1,764 per year.*

| NEWS | MARKETS | MUTUAL FUNDS | COMMODITIES | PROPERTY | PERSONAL FINANCE | PORTFOLIO | MESSAGES | LIVE TV | TV18 | TERMINAL |

Home   Business   Management Talk   Markets   Stocks   Politics   International   Tech   Lifestyle   Auto Expo   SME   Videos

Home » News » Business

Oct 09, 2015, 09:24 AM | Source: CNBC-TV18

# Cambridge Tech up 1800% in 1 year: What's making it tick?

*In an interview with CNBC-TV18, Chairman Aashish Kalra discussed the company's state of business and its outlook going forward.*

moneycontrol

Cambridge Tech up 1800 in 1 year Whats making it tick ▶

00:00:00 | 00:00:00 ◀))

Shares in Cambridge Technology Enterprises   have risen 1800 percent over the past one year. This co-incided with a robust increase in the firm's revenues (in the six months ending June, its revenues rose 103 percent year-on-year).

In an interview with CNBC-TV18, Chairman Aashish Kalra discussed the company's state of business and its outlook going forward.

"Our two year plan is to get to a minimum revenue of USD 2 million a month... gross margins will be between 60-80 percent," he said.

Cambridge Technology Enterprise (CTE) is a global business and technology services company. Its recent partnership with Fortune 500 companies like Oracle, Schneider and Amazon to capitalize on convergence of Cloud and Big Data has been fruitful for the company.

With Tally everythi

a piec

Ca

Accounting

Payroll

Tax

**NEWS**
MOST POPULAR

Chola Invest to set

DoT t appro infra, i

Lende Group Essar

Banks an NP says t

STOCK MARKET: Here'! event next w

See al

VIDEO OF THE DA'



*Below is the verbatim transcript of Aashish Kalra's interview with Mangalam Maloo & Reema Tendulkar on CNBC-TV18.*

**Reema:** I was reading your annual report and there you have indicated that the company is putting in a business plan and it will take two years to realise the potential. So, what constitutes your business plan where do you see the company head say in the next two years in terms of revenues as well as in terms of margins and size?

**A:** Since we took over the company on the January 1st we have really focused on as you said the convergence of cloud and big data. We think that transform the way the world does business and it is really about looking profit and loss (P&L) of our clients and helping them realise new potential from that P&L be it in cost savings or revenue growth. The clients tend to be very large corporations mostly in the United States (US).

The company Cambridge Technology is very small is very subscale and what we said was, we wanted to put a platform together and a plan together that involved three stages. Stage one was to take a business plan and put in the right partnerships. So over the first quarter we actually entered into partnerships with people like Oracle, Amazon etc there is a dozen odd partnerships. With them we built unique solutions and those unique solutions then we started looking at six different verticals.

In each verticals we have taken on a client that we are trying to build the solution for example in utilities we are working Schneider Electric. So, all the way from consumption of electricity to how it is produced and how do you optimise that entire supply chain is something we are working on. We are working with a firm called which is part of , to figure out the next genomics work stations on how you build new drugs how do you built new nutrition for pets.

We believe 80 percent of next generation of genomics will be on plants and animals. So, that stage two and then we move on to stage three which is get to into an optimal scale which we believe is at least two million a month in revenue.

**Mangalam:** Recently you extended your relationship with Schneider Electric so can you tell us what exactly is the nature of work that you do for Schneider Electric and what is the quantity of revenue or what is the quantum of business that this particular client generates? At the same time can you tell us what quantity of your total business is been generated by the top five clients for the company?

**A:** We have some strict confidentiality on what we discuss about clients. However, in broad strokes what we do for our client like Schneider is we work all the way from figuring out what are their big data needs. How do we optimise the data? What is the visualisation and what are the applications we build around it.

The broad framework tend to be fairly large and they could run in the millions of dollars but then each things gets broken into what is called the statement of work and typically those run into a few hundred thousand dollar each. You do it incrementally with each client and it gets to be different with each client. However, they tend to be very long-term relationships. they tend to be three-five-seven years relationships because you are taking on fairly substantial amounts of work.

**Reema:** Give us some sense of what could be the potential revenues or the revenue size of the company in the next three years and what will be the margin range that you believe you can sustain in your two year – five year plan. Some numbers to work with?

**A:** What we have already given as guidance is we believe our two year plan is to get to minimum revenue of a two million a month. We believe gross margins will be somewhere between 60-80 percent. On that we are sub optimal today so we are at the lower end of that. However, if you see the last two quarters revenues have increased roughly a 100 percent quarter-on-quarter from 2014-2015. Margins increase 500 percent what I call Q1 I think it is Q4 of last year. Q1 of this year was 800 percent so it should be inline.

**Reema:** What about the EBITDA level? Gross margin 60-80 percent but at the EBITDA level?

**A:** At the EBITDA level the increase has been even larger

**Reema:** Your guidance?

A: I think we should be somewhere in excess of 30 percent at least if not 40 percent. The big challenge right now we are facing is not clients, is actually finding the right talent and working with the right people. We are fortunate attrition rates are less than 0.3 percent. However, we are growing roughly 250 people.

We are growing the company, we hope to be somewhere between 500 and 750 next year. To find the right talent to train them to get them to the next level, we are spending a lot of money on the competence centers in the United States. As a group we have taken another company public in the US and we have done fairly well there.

Cambridge Tech stock price

*On March 23, 2016, Cambridge Technology Enterprises closed at Rs 122.00, up Rs 0.65, or 0.54 percent. The 52-week high of the share was Rs 162.40 and the 52-week low was Rs 15.43.*

*The company's trailing 12-month (TTM) EPS was at Rs 2.15 per share as per the quarter ended December 2015. The stock's price-to-earnings (P/E) ratio was 56.74. The latest book value of the company is Rs 13.82 per share. At current value, the price-to-book value of the company is 8.83.*

Tags   Aashish Kalra   Cambridge Technology Enterprises   cloud   Oracle   Amazon

RELATED STORIES



Corporate Announcement

**Cambridge Technology's EGM on April 06, 2016**
Cambridge Technology Enterprises Ltd has informed

**Cambridge Technology: Outcome of board meeting**
Cambridge Technology Enterprises Ltd has informed

**Cambridge Tech Dec '11 sales at Rs 8.45 crore**
Cambridge Technology Enterprises has reported a sa

**Cambridge Technology Enterprises board meeting on March 09, 2016**
Cambridge Technology Enterprises' board meeting wi

**Company is in a high growth mode: Cambridge Technologies**
In an interview to CNBC-TV18, Aashish Kalra, Chair

**Cambridge Tech consolidated Sep '15 sales at Rs 15.45 crore**
Cambridge Technolo Enterprises has reported a co

Set email alert for Cambridge Tech :   Set Alert

Ads by Google

> Stock Market Crash 2016 : Stock Market's "Day of Reckoning" Is Fast-Approaching. Shocking
www.thesovereigninvestor.com

> 18% Dividend Stock : But Not A MLP 100% Sustainable. Get the Rpt oilandgas-investments.com/Stock2016

Buy, Hold, Sell ? Hear it first on M3
Cambridge Tech up 1800% in 1 year: Whats making it tick?

Post your stock queries, tips and information on M3 forum

See all

Exhibit "2"

## CLIENT TRANSFER AUTHORIZATION FORM

TO:  Robert P. Brooks, Esq., Managing Partner
    Adler Pollock & Sheehan, P.C.
    One Citizens Plaza, 8th Floor
    Providence, RI 02903

DATE:  January 9, 2015

RE:   Trikona Advisers Limited; Asia Pacific Ventures Limited; and Aashish Kalra;
    Adler Pollock & Sheehan Client/Matter Nos. 403302/002

Please check one:

[ ✓ ]  I, Aashish Kalra, on behalf of Trikona Advisers Limited; Asia Pacific Ventures Limited; and Aashish Kalra; hereby request and authorize that all electronic and hard copy client files held by AP&S in connection with the above entities or persons be transferred to Burns & Levinson LLP at the address listed below:

    Gregory Girardin, Director of Operations and Records
    Burns & Levinson LLP
    125 Summer Street
    Boston, MA 02110

[  ]  I authorize AP&S to retain my client files.

_____
Aashish Kalra

Date:  January 9, 2015

**Exhibit "3"**

# BURNS & LEVINSON LLP

125 SUMMER STREET  BOSTON, MA 02110

T 617.345.3000  F 617.345.3299

BURNSLEV.COM

FEDERAL ID # 04.2265163

Trikona Advisers Limited/Asia Pacific
Ventures/Aashish Kalra
9 Placid Lake Lane
Westport, CT 06880

Michael C. Gilleran
Open Invoices
as of 11/19/15

## Statement of Account

49121 Trikona Advisers Limited/Asia Pacific Ve

| Matter Number | Date of Invoice | Invoice Number | Amount Billed | Transaction Date / Type | Payments / Adjs | Balance Due |
|---|---|---|---|---|---|---|
| *Matter Name: Chugh/ARC Capital/Haida Investment* | | | | | | 31,340.81 |
| 00000 | 03/05/15 | 860956 | 31,340.81 | | | 33,169.95 |
| 00000 | 04/09/15 | 863973 | 33,169.95 | | | 79,006.48 |
| 00000 | 05/04/15 | 864947 | 79,006.48 | | | 52,704.02 |
| 00000 | 06/04/15 | 867611 | 52,704.02 | | | 59,647.08 |
| 00000 | 07/08/15 | 870284 | 59,647.08 | | | 47,003.04 |
| 00000 | 08/04/15 | 871327 | 47,003.04 | | | 15,454.19 |
| 00000 | 09/03/15 | 874225 | 15,454.19 | | | 21,121.43 |
| 00000 | 10/08/15 | 876738 | 21,121.43 | | | 2,921.25 |
| 00000 | 11/05/15 | 878571 | 2,921.25 | | | |
| | | | 342,368.25 | | | 342,368.25 |

To accommodate you, we also accept Visa, MasterCard, Discover and American Express. For those clients who have requested it, a confidential authorization form is enclosed. Please fill in all information, including the VV2 value (*CVV2 Security Identification Number).

* (For MC/Visa/Discover cards this is the last 3 digits of the account number in the signature strip on the back of the card. For Amex cards, it is the 4 digit code (not embossed) on the front of the card).

Please visit burnslev.com/online-payment to make a secure online payment of your invoice.

If you have any questions, please email Anthony Bertulli at abertulli@burnslev.com or call at (617) 345-3744.

If payment has been sent since date of this statement, please disregard.

Exhibit "4"

Aashish Kalra - Wikipedia, the free encyclopedia

# Aashish Kalra

From Wikipedia, the free encyclopedia

**Aashish Kalra** (*also known as Ashish Kalra*) is a business professional and a pioneering equity investor in technology, infrastructure, real estate, energy, logistics and hospitality. Aashish currently serves as chairman of Cambridge Technology Enterprises[1] and Cambridge Innovations, an investor and technology partner to early stage companies leveraging technologies in the area of cloud and big data for disruption.[2] Since his appointment, Aashish has been credited for transforming the company as a sophisticated technology platform focused on the convergence of Cloud and Big Data and working with selective Fortune 500 companies– a move that has seen the company's stock price rise by over 1800%[3] and double its revenue in 1 year.[4] Prior to Cambridge Technology Enterprises, he was the Founder and Managing Director of Trikona Capital, where he deployed US $1 billion[5] in Indian infrastructure development and created value of approximately US



**Aashish Kalra**

| Nationality | Indian American |
| Occupation | Investor |

$10 Billion.[6] He is a socially conscious investor[7][8] and often lent support to new companies with finance, strategic recruitment, planning and partnerships, whilst also serving on their board of directors. Aashish has been often quoted[9] in leading Indian & international media and was featured in the "Young Turks" program on CNBC.[10][11] Having led Cambridge Technology Enterprises to numerous milestones, Aashish has been interviewed a number of times by India's leading business media. Following recent success with Cambridge Technology Enterprises and launching Cambridge Innovations –he was featured on CNBC-TV18[12] and Bloomberg TV India.[13] Aashish Kalra was also featured on TV5 (India) where he shared his thoughts on a healthy forecast for Cambridge Technology Enterprises[14] and with Bloomberg TV India where he spoke about his plans for the company's growth.[4] He has also written a number of industry articles, most recently on *"Is big data a sound investment?"*, published on [India Infoline][15] and was also recently quoted on *"How a blend of technology and human touch can help HR to manage their quantitative information and 'human capital' more effectively"*.[16]

He is a frequent international speaker and has participated in industry events in America, Europe, India, China and the Middle East. In 2008, he was named one of the "Outstanding 50 Asian Americans in Business"[17] and also a panel speaker at the One Globe: Uniting Knowledge communities conference where he discussed *"Digital India: Can e-commerce entrepreneurs drive digital adoption in India?"*[18]

# Contents

- 1 Early life
- 2 Career
    - 2.1 Cambridge Technology Enterprises
    - 2.2 Cambridge Innovations
    - 2.3 CTE LLC/IBCC [50] & other technology ventures
    - 2.4 Cambridge Energy Holdings (CEH Global), Cambridge Energy Resources (CER Inc) , now known as, Cambridge Clean Energy Limited (CCE)
    - 2.5 Trikona Capital
    - 2.6 Spydre LLC
- 3 References
- 4 External links

# Early life

Mr. Kalra attended The Doon School at Dehradun in India. He also holds a master's degree in international finance from Brandeis University, Waltham, USA, and graduated from St. Stephens College, Delhi with a bachelor's degree in economics (honors). He did his thesis on the Japanese Financial System at Sophia University, Tokyo, Japan.

# Career

## Cambridge Technology Enterprises

Aashish took over the company formally on the 1 January 2015. Under his leadership, Cambridge Technology Enterprises embarked on two year business plan (January 2015 till December 2016) focused on building the right partnership, invest in talent, expand the company's service offerings and acquire new customers across key verticals.[19]

Cambridge Technology Enterprises has overseen a 156% growth in net profit and 86% growth in revenue for the quarter that ended January–March 2015.[1] In June 2015, the company also saw a rise in its overall revenue by 109.27% in the quarter ended June 2015 as against during the previous quarter ended June 2014.[20][21] Since then, the company has also seen an incremental growth[22] & is now looking to investing hiring the right talent and training them and upskilling current employees for the future by in setting competency centers[23]

- Net profit rose by 1020.00% in the quarter ended September 2015 as against the previous quarter ended September 2014[24][25]
- Cambridge Technology Enterprises also saw Sales rise by 109.63% in the quarter ended September 2015 as against the previous quarter ended September 2014[26]
- Coinciding with the robust growth in revenues, shares in Cambridge Technology Enterprises rose over 1800% in 1 year[3][27][28][29][30]

The company has also build several strategic partnerships with leading Fortune 500 companies such as Amazon.com and Oracle.

The success can largely be attributed to Aashish's vision of transforming the company as a sophisticated technology platform based on Big Data, Analytics[31] and Cloud with the focus on building a better incubation model out of India to test technologies that would later be internationalized-a move which has seen the company's stock rise by over 700% over the year.[4]

### Strategic Partnerships

- Oracle - CTE achieved Platinum Partner status in Oracle Partner Network following which Cambridge Technology Enterprises is eligible to develop, sell, and implement the full stack of Oracle Cloud products and solutions. Maintaining said focus on the intersection of big data and cloud, CTE has strengthened its Oracle product offerings particularly with Platform as a Service (PaaS), Data as a Service (DaaS), and Infrastructure as a Service (IaaS) – all of which are components of Oracle Cloud Solutions.[32][33]
- ForgeRock -Cambridge Technology Enterprises partnered with ForgeRock to address the expanding market opportunity for identity management solutions that leverage the power of cloud, mobile and Internet of Things adoption[34][35]
- Apica Systems[36]
- Tableau Software Alliance partnership that allows Cambridge Technology Enterprises to integrate Tableau's software into its Cloud and Big Data offerings[37]
- New Relic - As a member of New Relic's partner program, Cambridge Technology Enterprises's customers will be enabled to use the company's suite of software analytics products to enhance software performance management and monitoring.[38][39]
- I.D. Systems -Cambridge Technology Enterprises signed a multi-year agreement is composed of multiple system, smoke, and automation testing initiatives.[40][41]

## Cambridge Innovations

On 16 December[42] Mr. Aashish Kalra also announced that Cambridge Technology Enterprises would be launching an investment hub, Cambridge Innovations[2] -for an early-stage investment in India & US-based start-ups, to tap into emerging technology and innovation, while at the same time address its core problem of getting employees trained in new technologies.[43][44]

Cambridge Innovations (CI), is an investor and technology partner to early stage companies leveraging technologies in the area of cloud and big data for disruption.[45]

Cambridge Innovations aims to provide capital, people and technical knowledge to early stage entrepreneurs looking to reach the next level of growth with reduced technology risk. The firm will provide up to 25% of seed capital to launch, a two-year technology plan and the product team to help execute it.[46]

As a long-term partner and investor, CI will accelerate a start-up's growth and success. Entrepreneurs can expect to:[47]

- Get to a better Series A faster
- Have time to focus on sales and marketing, rather than solely on product development
- Accelerate their product roadmap strategically, and
- Collaborate with a scalable and redundant technology team

In a recent interview with Dataquest,[48] Aashish, Chairman, Cambridge Innovations was quoted

*"Cambridge Innovations understands the challenges facing entrepreneurs today; a faster-time to market, the ability to scale, the right product development team and the necessary capital are the difference between long term success, or failure. CI will meet these needs and remain committed to each start-up. This benefits Cambridge Technology Enterprises by creating a strong pool of future clients and access to the strongest innovation in the field."*

Under Aashish's tutelage, Cambridge Innovations has targeted investing in 12 US-based start-ups by March 2017 and have plans in place to scale it up to 50 investments over the next three years.[49]

*Cambridge Innovations currently has three firms in its portfolio:*

- **Causemo** is evolving the experience of charitable giving by seamlessly integrating cause appeals into everyday digital consumer experiences. Based in Boston, Massachusetts, Causemo is a digital giving platform targeting the US$358 billion a year US non-profit donation market. The company is creating simple and engaging ways for consumers to learn about, donate to, and champion a cause. For causes, corporate sponsors, apps and sites, Causemo makes it easy to customize campaigns and reach target audiences. Causemo recently raised US$4 million is currently partnered with nearly 20 cause organizations, including Boys & Girls Clubs of America, Children's Miracle Network Hospitals, City Year, and Save the Children.
- **Authess** is changing the way education and professional assessments are done, by using data science to determine what someone can do. Based in Boston MA, the company is led by Chris Kaiser, the former Provost of MIT, and former mobile executives from Pearson. The company's mobile and online assessments platform utilizes creative problem solving challenges to determine a person's readiness to apply his or her knowledge to real-world problems. This enables educators and employers to measure, for the first time, effectively and affordably what someone can do.
- **RoadZen**, with its app StrandD, is disrupting the roadside assistance market through a transformative offering. Started in Pittsburgh, Pennsylvania by a Carnegie Mellon alumni, StrandD is the largest on-demand roadside assistance service in India with 18,000 providers in 1,500 cities. StrandD is building a global footprint through key partnerships and will launch service in its next country in Q1 2016.

# CTE LLC/IBCC [50] & other technology ventures

Mr. Kalra is a Venture Capitalist (VC) and was a partner at Cambridge Technology Enterprises (CTE LLC). CTE LLC established several successful companies in the Information Technology space. At CTE LLC, Aashish Kalra was also one of the co-founders of Cambridge/Samsung Partners, one of the earliest independent venture capital firm in Boston in 1996 in partnership with Samsung of Korea with a vision to provide funding and assistance for seed and early stage IT companies. He was also a co-founder of Cambridge Samsung Resources, a leading Systems Integrator. He also concluded successful

partnerships and joint ventures with Hewlett-Packard, Marubeni, NEC and other global 1000 companies. CTE LLC/Cambridge Samsung Partners/IBCC have been associated as founders and investors of several successful technology companies.

*Key IPOs include*:

- Cambridge Technology Partners: IPO in 1990, Acquired by Novell in 2002.
- Open Environment: IPO in 1993, Acquired by Inprise in 1995.
- i-Cube: IPO in 1995, Acquired by Razorfish in 1998,
- One Wave: IPO in 1997
- Integrated Computing Engines (ICE): IPO in 1997, Acquired by Media 100 in 2000[51]
- Cambridge Samsung Resources, IPO in 1998, Acquired by Pretzel Logic[52]
- C-Bridge: IPO in 1999, Acquired by Progress Software in 2003,
- N*Able technologies: Acquired by Wave Systems in 1999[53]
- Cambridge Technology Enterprises Limited: IPO in 2007[54] in 2009.

## Cambridge Energy Holdings (CEH Global), Cambridge Energy Resources (CER Inc) , now known as, Cambridge Clean Energy Limited (CCE)

Aashish Kalra is a Managing Partner at Cambridge Energy Holdings and its subsidiary Cambridge Energy Resources, a leading Renewable Energy/Clean Technology company which specializes in developing energy efficient products and services for the telecom tower industry under every possible grid availability such as off-grid, on-grid and unreliable grid solutions with a focus on EmSaaS (Energy Management Solution as a service) across the globe. Recently Cambridge Energy Resources merged with Clean Power Systems Holdings (CPS) of Africa, resulting in the new venture, Cambridge Clean Energy(CCE).

Cambridge Clean Energy (CCE) has raised over $21 million in Series A funding led by technology-focused venture capital firm Amadeus Capital Partners.[55][56] Cambridge Clean Energy is currently working towards expanding their operations across India and Africa with an aim to become the largest distributor of renewable power in emerging markets.[57] CCE will also strive to adhere to the Cambridge Energy Resources vision of being socially conscious by achieving the lowest cost per kWh of energy.[57]

## Trikona Capital

He was one of the earliest Private Equity(PE) investors in India and responsible for raising one of the largest funds dedicated to the Indian infrastructure and real estate markets. As a co-founder and one of the principals of Trikona Capital,[58] the manager for a USD $500 million India-focused private equity fund called Trinity[59] listed on the London Stock exchange's AIM market in 2005, Mr. Kalra was principally responsible for the creation of the Trikona platform in India[60] including buildup of the in-country team and partnerships with a number of India's premier public/private development vehicles such as IL&FS[61] and HUDCO. During this time, Mr. Kalra worked closely with IL&FS and IL&FS Investment Managers and was the key member of the investment committees of the joint ventures that invested in excess of USD $500million[62] together.

Mr. Kalra was also a key member of Trikona's Investment Committee, which invested in some of the most successful Indian real estate and infrastructure transactions[63][64] over the past decade. Some key exits were IPOs of Pipavav Shipyard Ltd., IL&FS Transportation Networks Ltd., and D B Realty Ltd. The combined asset value of the IL&FS and Trikona portfolio was in excess of USD $10 billion.[65] Over the investment period between 2005 and 2008, Trikona executed over 5 exits, achieving IRR's of over 95%; the fund also grew its AUM to approximately USD $1bl. by 2008. Mr. Kalra stepped down from running Trikona following the purchase of a controlling stake in Trinity by hedge fund investors[66] in 2009[67][68][69]

## Spydre LLC

Aashish Kalra established Spydre LLC a global hi-tech venture catalyst, where he grew the portfolio to over $50 mm and a client base of over 25 companies spread across three continents (Europe, North America, South America) and established strategic relationships whilst maintaining a profitable business model.

*Key Strategic Investors include*:

- WPP plc
- Merrill Lynch
- IBM

He is a socially conscious[7] investor who has built one of the largest platforms for institutional investors looking to invest in Indian infrastructure and real estate.[70]

## References

1. Sunitha Natti. "CTE registers 156% increase in net profit in first quarter".
2. "Cambridge Technology Enterprises launches Cambridge Innovations for early stage entrepreneurs".
3. "Cambridge Tech up 1800% in 1 year: What's making it tick?".
4. *Aashish Kalra Chairman of CTE Live Interview with Bloomberg TV on 11th August, 2015.*
5. "New York-based Trikona Capital to enter into realty biz in India".
6. "Trikona May Invest $10 Billion in Indian Property Over a Decade".
7. "Investor Aashish Kalra Talks About Shaping a New India".
8. "Hall Monitors".
9. "Budget 2015: IT Industry's Expectations".
10. "Dollar flow to realty mkt to grow over 3x by 2010".
11. *Aashish Kalra on CNBC's Young Turks.*
12. *Cambridge Tech Enterprises: Stock Up 1800% In 1 year - Oct 8.*
13. "Aashish Kalra, Chairman - CTE, live interview announcing launch of Cambridge Innovations".
14. *18th July 2015 Business Weekend.*
15. "Is big data a sound investment?".
16. "Is HR losing its'human' aspect?" (PDF).
17. "Outstanding Asian Americans in Business".
18. "One Globe 2015 Speaker".
19. "CTE is focused on building the partnerships and talent base".

20. "Cambridge Technology Enterprises reports consolidated net profit of Rs 1.20 crore in the June 2015 quarter".
21. "Cambridge Technology revenues double in June quarter".
22. "Company is in a high growth mode: Cambridge Technologies".
23. "Cambridge Tech to hire 300 in a year".
24. "Cambridge Technology Enterprises consolidated net profit rises 1020.00% in the September 2015 quarter".
25. "Cambridge Technology Enterprises standalone net profit rises 896.00% in the September 2015 quarter".
26. "Cambridge Tech net rises to O2.8 cr; to increase focus on hiring talent".
27. "Cambridge Tech Enterprises: Stock Up 1800% In 1 year - Oct 8".
28. "Cambridge Tech up 1800% in 1 year: What's making it tick?".
29. "Cambridge Tech up 1800% in 1 year: What's making it tick?".
30. "Cambridge Tech up 1800% in 1 year: What's making it tick?".
31. "Analytics The Mobile Way". Express Computer.
32. "Cambridge Technology Enterprises Becomes Oracle Gold Partner Cambridge Technology Enterprises becomes Oracle Gold Partner in the U.S.".
33. "Cambridge Technology Enterprises becomes Oracle Platinum Partner".
34. "Cambridge Technology Enterprises partners with ForgeRock".
35. "CTE Announces Partnering Agreement with ForgeRock".
36. "Cambridge Technology Enterprises Announces Partnership with Apica Systems".
37. "CTE Obtains Alliance Partner Status with Tableau".
38. "Cambridge Technology enters into partnership with New Relic".
39. "Cambridge Technology Enterprises Ltd Joins New Relic's Partner Program Latest project fueling CTE's access to software analytics".
40. "Cambridge Technology Enterprises enters into contract with I D Systems".
41. "Cambridge Technology Enterprises Announces Contract with I.D. Systems".
42. "Cambridge Tech eyes US startups".
43. "Cambridge Technology Enterprises launches Cambridge Innovations for early stage entrepreneurs".
44. "Cambridge Tech launches Cambridge Innovations for early stage entrepreneurs".
45. "Cambridge Technology Enterprises Launches Cambridge Innovations For Early Stage Entrepreneurs".
46. "Cambridge Tech to invest in 50 US-based start-ups".
47. *Aashish Kalra, Chairman - CTE, live interview announcing launch of Cambridge Innovations.*
48. "Cambridge Technology Enterprises launches Cambridge Innovations for early stage entrepreneurs".
49. "Cambridge Innovations will have a portfolio of 50 companies over 3 years: Aashish Kalra".
50. "IBCC Corp".
51. "Media 100 Continues Buying Spree With ICE Acquisition".
52. "Pretzel Logic Meets Intense Demand for Change Management for E-Businesses With Aggressive Company and Solutions Expansion".
53. "Wave Systems Acquires N*ABLE Technologies".
54. "Cambridge Technology Enterprises Ltd".
55. "Amadeus Capital invests in India-focused energy management firm".
56. "Amadeus Capital Partners invests in Cambridge Clean Energy".
57. "Cleantech firm Cambridge Clean Energy raises $21M from Amadeus Capital, others".
58. "Real Estate Raj".
59. "Trinity takes AIM at $1 bn more".
60. "Indian Real Estate: Investors Are Shopping, but Are They Buying Hype?".
61. "IL&FS arm targets $900m mop-up for realty sector".
62. "Trikona Capital plans a realty check with second public issue".
63. "Asia focus: India's big build begins ground level up".
64. "Asia focus: Trinity Capital to invest £11 m in luxury hotels in India".
65. "Trinity Capital lines up $10 bn to develop 3 metros".
66. "Activist property investor QVT financial bays for Trikona's blood".
67. "Advantage Hedge Funds: Trikona Trinity Capital To Sell Assets".
68. "AIM-Listed Trinity Capital, Trikona Advisers Reach Settlement".
69. "Hedge Fund QVT Financial: UK Activist Portfolio".
70. "Extra: Building Opportunity in India".

# External links

- Aashish Kalra (http://www.ctepl.com/index.php/management,)
- Aashish Kalra (http://www.bloomberg.com/research/stocks/people/person.asp?personId=27312646&ticker=TKNTF/)
- Aashish Kalra, *The Soho Loft* (http://thesoholoft.com/speaker-profile-of-aashish-kalra/)
- Aashish Kalra (http://www.oneglobeconference.com/speaker/2015/aashish-kalra-one-globe-2015-speaker/), One Globe Conference
- *Cambridge Energy Resources Inc, Bloomberg* (http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=129405003,)
- *Cambridge Energy Holdings Team* (http://www.cehglobal.com/team.html,)
- *Cambridge Energy Resources Leadership Team* (http://cer-inc.com/LeadershipTeam.html,)

Retrieved from "https://en.wikipedia.org/w/index.php?title=Aashish_Kalra&oldid=710925923"

Categories: St. Stephen's College, Delhi alumni | Brandeis University alumni | Businesspeople of Indian descent | The Doon School alumni | American venture capitalists | Asian-American businesspeople

- This page was last modified on 19 March 2016, at 22:04.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Exhibit "5"



पंजाब पंजाब PUNJAB                                               V 092047

IN THE MATTER OF ARBITRATION BEFORE THE JUSTICE

N.K.SUD (RETD.) -- The SOLE ARBITRATOR

BETWEEN:

AASHISH KALRA
S/o Devinder Parkash Kalra
Aged about 43 years
R/o 100, Model Town, Panipat, Haryana                    ...Claimant

AND

M/S SANKALP BUILDWELL PVT. LTD.
S-35A/1, Hargovind Enclave,
Opp. DLF Farms,
Chhatarpur, New Delhi-110074
Acting through its duly constituted Attorney
Mr. Raj Sehgal                                           ...Respondent

6



भारतीय गैर न्यायिक

एक सौ रुपये    Rs. 100

रु. 100    ONE
HUNDRED RUPEES

सत्यमेव जयते
भारत INDIA
INDIA NON JUDICIAL

पंजाब पंजाब PUNJAB                                    V  089411

## ARBITRATION AWARD

1. That I have been appointed as an Arbitrator by the parties vide their letter dated 10.08.14 in respect of a dispute/claim raised by the Claimant Mr. Aashish Kalra against the Respondent Company M/s Sankalp Buildmart Pvt. Ltd. (SBPL);

2. That I have entered into an arbitration vide Jurisdiction clause of the parties' respective agreement and have perused the documents filed by the parties before me.

3. That vide Director Agreement dated 02.05.2012 it was agreed between the parties that the Claimant was entitled to remuneration in terms of Salary of Rs. 100,00,000/- (Rupees One Crore Only)



पंजाब पंजाब PUNJAB

U 297929

per annum, performance bonus of Rs. 50 Lakhs or 10% of Profits whichever is more, and Travelling allowances of Rs. 3 Lakhs per month. It was subsequently agreed on 30.04.2012 that the Claimant Mr. Ashish Kalra would also be paid Litigation expenses of Rs. 25 Lakhs per month.

Thereafter the parties entered into an agreement on 03.04.2014 wherein it was agreed between the parties that since the Respondent Company was unable to pay its creditors as it was in a dispute with its Bankers and was consequently unable to operate its accounts. It, therefore, authorized the Claimant Mr. Aashish Kalra to settle and pay to the said creditors, as per the list submitted by the parties. The Respondent Company has suffered huge losses including a penalty payment of 2.5 Crores to Cambridge Energy



8

Resources Pvt. Ltd.(CERR) due to its inability to execute the purchase of a 1Megawatt Solar Plant, Further in order to reimburse the Claimant Mr. Aashish Kalra, the Respondent Company had executed another agreement 03.04.2014.

5. That in terms of the said agreement the Claimant Mr. Aashish Kalra incurred expenses for and on behalf of the Company amounting to Rs. 14,52,83,774.25 (Fourteen Crore Fifty Two Lakhs Eighty Three Thousand Seven Hundred Seventy Four and Twenty Five Paisa only). It is this amount coupled with the arrears of his Salary which the Claimant Mr. Aashish Kalra is claiming by way of this Arbitration.

6. That after the Claimant Mr. Aashish Kalra demanded his payment from the Respondent Company, the parties have invoked the arbitration clause.

7. On invocation of the Arbitration clause the parties negotiated and reached a settlement as the Respondent Company accepted the claim and did not dispute the amount payable to the Claimant Mr. Aashish Kalra. However it expressed its inability to pay the said amount despite having made its best efforts in order to be able to operate its accounts in HSBC, Connaught Place, New Delhi and

9

other Banks. On his part, the Claimant Mr. Aashish Kalra agreed to reduce his claim of interest from 18% to 12% p.a.

9. I have perused the documents filed by the parties which reveal that the Respondent Company has made all possible efforts in order to be operational. I have also seen the documents relating to the case filed by the Respondent Company against HSBC Bank and from the said documents it is evident that HSBC Bank appears to have acted in an unjustifiable manner and without any basis. It has acted merely on the basis of some dispute before the Company Law Board between the Share Holders, of which, by its own admission, the Bank has no knowledge nor is it a party in that case. It has also not received any order from any Court in this regard. It is a settled position of law that the Banks are bound to accept the resolution passed by the Board of Directors and cannot become an Arbitrator in the dispute, if any, amongst the Share Holders.

10. It is apparent that the Respondent Company and its Directors have made concerted efforts to operate the business. They have approached the HSBC Bank and  various other authorities of Government of India including the RBI by filing applications with the appropriate foras.

10

10. The Respondent Company and its Directors were faced with a serious issue that if they do not settle the dispute with the Claimant or if the Claimant Mr. Aashish Kalra does not pay the Company's bills the Company would go bankrupt and would be faced with impending litigation under section 433 of Indian Companies Act, 1956 which in all probability could lead to the Winding Up of the Respondent Company.

11. It is also apparent that both the parties have taken all possible steps to promote the business of the Respondent Company for which its Directors Mr. Aashish Kalra and Mr. Saurabh Killa have made extra efforts. By taking the liability of the Respondent Company on himself, the Claimant has gone beyond his obligations of fiduciary responsibilities.

12. In view of the aforesaid, I am of the opinion that the Claimant Mr. Aashish Kalra is entitled to an amount of Rs. Rs. 14, 52, 83,774.25 (Fourteen Crore Fifty Two Lakhs Eighty Three Thousand Seven Hundred Seventy Four and Twenty Five Paisa only) as mutually agreed to by both the parties in the present proceedings before me. Accordingly the Respondent Company is directed to pay the aforesaid amount of Rs. 14, 52, 83,774.25 (Fourteen Crore Fifty

Two Lakhs Eighty Three Thousand Seven Hundred Seventy Four and Twenty Five Paisa only) together with accrued remuneration and other incentives and interest on the above amount @ 12% per annum till the date of payment.

Justice (Retd.) N. K. Sud

Sole Arbitrator

AMBIKA TOWER, 4th Floor,

Police Lines Road, Jalandhar 144001.

Dated 12.09.2014

Exhibit "6"



**TRIKONA ADVISERS LIMITED v. HAIDA INVESTMENTS LIMITED ET AL.**

SC 19439

**SUPREME COURT OF CONNECTICUT**

318 Conn. 476; 122 A.3d 242; 2015 Conn. LEXIS 246

**April 21, 2015, Argued**
**September 1, 2015, Officially Released**

**PRIOR HISTORY:**      [***1] Action for interpleader to determine the rights of the parties to certain stock of the named plaintiff, brought to the Superior Court in the judicial district of Fairfield and transferred to the judicial district of Hartford, Complex Litigation Docket, where the court, Miller, J., rendered an interlocutory judgment of interpleader, from which the defendants appealed. *Trikona Advisers v. Haida Invs.,* 2013 Conn. Super. LEXIS 4605 (Conn. Super. Ct., Oct. 25, 2013)

**DISPOSITION:**   Affirmed.

**SYLLABUS**

The plaintiff T Co., an investment advisory corporation formed by K and the defendant C and incorporated in the Cayman Islands, brought an action alleging, inter alia, the breach of a fiduciary duty by C. The title to the shares of stock representing C's one-half interest in T Co. was held by the defendants A Co. and H Co. The title to the shares of stock representing K's one-half interest in T Co. was held by the plaintiff P Co., which allegedly transferred title to its creditor, the plaintiff V Co., after defaulting on certain loan obligations. A Co. and H Co. subsequently commenced an action in the Cayman Islands seeking to dissolve T Co., naming P Co. as the respondent. After awarding A Co. and H Co. attorney's fees, the Cayman Islands court granted an ex parte provisional charging order against the T Co. stock [***2] held by P Co. in an amount equal to the award of attorney's fees. Thereafter, P Co. and V Co. intervened in the present case and filed an interpleader complaint, seeking, inter alia, a judicial determination as to the proper owner of the T Co. shares held by P Co. The trial court rendered an interlocutory judgment of interpleader, concluding that P Co. and V Co. still had claims to the shares of stock and that it could not make the necessary determination as to which parties were entitled to an interest in

the shares until a trial on the merits was held. From that judgment, H Co. appealed. *Held:*

1. P Co. could not prevail on its claim that H Co. lacked standing to appeal from the trial court's interlocutory judgment of interpleader, this court having concluded that, although H Co. disclaimed any possessory interest in P Co.'s shares of T Co. stock on appeal, as a secured creditor of P Co. by means of the order issued by the Cayman Islands court, H Co. had a sufficient personal and legal interest in the subject matter of the case to establish classical aggrievement; moreover, because the trial court's interlocutory judgment of interpleader effectively deprived any party of the use of [***3] the shares of stock and the ability to exercise any rights over the shares until a judicial determination is made, the case satisfied the standard for classical aggrievement.

2. The trial court properly rendered an interlocutory judgment of interpleader: the facts alleged by P Co. and V Co., taken as true, were sufficient to establish that there were facially competing claims to P Co.'s shares of T Co. stock, and this court declined H Co.'s invitation to determine the viability of those competing claims under the law of the Cayman Islands because the parties will have an opportunity to address such issues when the merits of the various claims are adjudicated by the trial court; furthermore, because the parties have been involved in multiple proceedings in several jurisdictions and the underlying dispute is likely to continue until the ownership of the shares is determined, this court determined that it was in the interest of wise judicial administration to resolve all issues in a single proceeding with all interested parties present.

**COUNSEL:** John G. Balestriere, pro hac vice, with whom were Jillian L. McNeil, pro hac vice, Stefan Savic, and, on the brief, James T. Shearin, for the appellants [***4] (defendants).

318 Conn. 476, *; 122 A.3d 242, **;
2015 Conn. LEXIS 246, ***

Michael C. Gilleran, pro hac vice, with whom, on the brief, was Christopher L. Ayers, for the appellees (named plaintiff et al.).

Robert D. Laurie, with whom, on the brief, was Shrina B. Faldu, for the appellee (plaintiff Vera Financial Corporation).

JUDGES: Rogers, C. J., and Palmer, Zarella, Eveleigh, Espinosa and Vertefeuille, Js. EVELEIGH, J. In this opinion the other justices concurred.

OPINION BY: EVELEIGH

OPINION

[**244] [*477]   EVELEIGH, J. This action arises out of a dispute over the control and ownership of 500 shares of stock (shares) in the named plaintiff, Trikona Advisers Limited (Trikona), an investment advisory corporation specializing in Indian real estate, which is incorporated in the Cayman Islands. The plaintiffs Asia Pacific Ventures Limited (Asia Pacific) and Vera Financial Corporation (Vera Financial) brought an interpleader action, pursuant to General Statutes § 52-484, to determine ownership [*478] of the shares.[1] The named defendant, Haida Investments Limited (Haida), appeals from the judgment of the trial court rendering an interlocutory judgment of interpleader.[2] On appeal, Asia Pacific claims that Haida lacks standing to appeal because Haida was not aggrieved by the trial court's interlocutory judgment of interpleader.[3] [**245] Haida [***5] contends that there are no competing claims to the shares warranting the trial court's interlocutory judgment of interpleader.[4] We conclude that Haida has established aggrievement and that the [*479] trial court properly rendered an interlocutory judgment of interpleader because Asia Pacific and Vera Financial alleged facts sufficient to establish that Haida has a claim to the shares and that there are facially competing claims to the shares. Accordingly, we affirm the judgment of the trial court.

1   We note that, although Trikona filed the original complaint in the underlying action, it was not named as a party in the interpleader complaint by Asia Pacific and Vera Financial. For the sake of simplicity, we refer to all of the plaintiffs by name.
2   The other defendants in the present case are Rakshitt Chugh and ARC Capital, LLC. Although Chugh was named as a defendant in the original complaint filed by Trikona, he was not named a party in the interpleader complaint filed by Asia Pacific and Vera Financial. ARC Capital, LLC, was named as a defendant in the inter-

pleader action, but is not a party to the present appeal. For the sake of simplicity, we refer to all of the defendants by name.
3   We note that [***6] Trikona has filed a joint appellate brief with Asia Pacific and that Rakshitt Chugh has filed a joint appellate brief with Haida. Because neither Trikona nor Chugh were named as parties to the interpleader action filed by Asia Pacific and Vera Financial, we ascribe the various assertions contained within these joint briefs to Asia Pacific and Haida, respectively.
4   Insofar as Haida claims that the trial court's interlocutory judgment of interpleader interferes with a proceeding involving the shares in the Cayman Islands in violation of principles of international comity, the argument is premised on conclusory statements. Although Haida cites to one case for the general principle of international comity, Haida does not undertake any analysis or application of the law to the facts in this case. Furthermore, to the extent that Asia Pacific claims that the failure of ARC Capital, LLC, to appeal from the trial court's judgment of interpleader deprives this court of the authority to reverse the trial court's judgment, the argument is made in a mere three sentences of its appellate brief and is unaccompanied by any supporting analysis or citation to relevant legal authority. We consider these [***7]   claims inadequately briefed and, therefore, decline to address them. See *Electrical Contractors, Inc. v. Dept. of Education*, 303 Conn. 402, 444 n.40, 35 A.3d 188 (2012) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of 'conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . .'" [Citations omitted.]).

The record reveals the following facts and procedural history, which provide the necessary background for the resolution of this appeal. The present interpleader action stems from a dispute between two families over the ownership and control of Trikona.[5] In 2006, Aashish Kalra[6] and Rakshitt Chugh formed Trikona. Asia Pacific allegedly owns 50 percent of Trikona stock, representing Kalra's interest. Haida and ARC Capital, LLC (ARC Capital), collectively own the remaining 50 percent of Trikona stock, representing Chugh's interest. Kalra and Chugh initially were comanaging directors of Trikona, sharing equal operational control over the corporation, and they both served on Trikona's board of directors since its inception.[7] On February 24, 2012, Trikona filed a complaint alleging, inter alia, that Chugh, [***8] act-

318 Conn. 476, *; 122 A.3d 242, **;
2015 Conn. LEXIS 246, ***

ing in his capacity as the agent of Haida, had breached his fiduciary duties owed to Trikona (underlying complaint). In the underlying complaint, Trikona sought the [*480] [**246] imposition of a constructive trust on the stock held by Haida and ARC Capital.[8]

5    These parties have filed several actions in multiple domestic and international courts. For example, other than the present action, the parties have filed actions in the United States District Court for the District of Connecticut, the New York Supreme Court, the Grand Court of the Cayman Islands, India, and Mauritius. Although the number of proceedings and the variety of venues may provide context as to the ongoing nature and extent of the dispute between the parties, only the proceeding before the Grand Court of the Cayman Islands is relevant to the present appeal. We discuss that proceeding in more detail subsequently in this opinion.

6    Although Kalra is not a party to either the underlying action or the interpleader action in an individual capacity, we note that he signed the verified complaint in the underlying action on behalf of Trikona and filed an affidavit in support of the subsequent interpleader complaint.

7    In January, 2012, the board [***9] of directors of Trikona expelled Chugh.

8    Trikona also named Haida, in its corporate capacity and in its capacity as the alleged alter ego of Chugh, as a defendant.

Between 2010 and 2012, Vera Financial made a series of unsecured loans to Asia Pacific. In April, 2013, Vera Financial and Asia Pacific entered into an agreement, which consolidated the unsecured loans into one secured loan and granted Vera Financial a security interest, not to exceed $500,000, in all of the assets of Asia Pacific, including Asia Pacific's shares in Trikona. The agreement also included a special power of attorney, by which Asia Pacific granted Vera Financial the right to acquire, sell, transfer, assign, and dispose of all or any part of the shares. Asia Pacific subsequently defaulted on its obligation under the agreement. Vera Financial alleges that, in July, 2013, Asia Pacific "executed a stock power transferring and/or assigning all of its ownership rights in the shares to Vera Financial."

In February, 2012, Haida and ARC Capital, as shareholders of Trikona, filed a petition to wind-up and dissolve Trikona in the Grand Court of the Cayman Islands and named Asia Pacific as the principal respondent in the action. [***10] Haida and ARC Capital also sought the immediate appointment of provisional liquidators, otherwise known in the United States as trustees. The Grand Court of the Cayman Islands granted this request in January, 2013, and awarded Haida and ARC Capital approximately $760,000 in attorney's fees against Asia Pacific. Haida and ARC Capital moved to attach the shares and the Grand Court of the Cayman Islands subsequently granted an ex parte provisional charging order against the shares in the amount of the judgment that had been previously awarded. In its appellate brief before this court, Haida represents that, once the charging order was made absolute, Haida and ARC Capital [*481] issued a summons for the sale of the shares by public auction.

On October 4, 2013, Asia Pacific filed a motion in the Superior Court seeking permission to tender the shares to that court or, in the alternative, the appointment of a temporary receiver to hold the shares. By a complaint dated October 23, 2013 (interpleader complaint), Asia Pacific and Vera Financial commenced the present interpleader action, seeking, among other relief, a final judicial determination as to the proper owner of the shares.[9] Haida and ARC Capital [***11] did not file an answer to the interpleader complaint denying the factual allegations contained therein.[10]

9    In the interpleader complaint, Asia Pacific and Vera Financial combine requests for permissive intervention and a judgment of interpleader. Count one of the complaint requests interpleader relief. We note that Asia Pacific and Vera Financial filed a revised complaint dated November 27, 2013, containing identical allegations, but in which they solely request interpleader relief. Neither Haida nor Chugh challenge the procedural nature in which this interpleader action was instituted. Therefore, we do not address that issue.

10    We note that Haida filed a memorandum of law in opposition to Asia Pacific's motion to intervene, but it made no objection to the interpleader relief sought. Furthermore, we note that even if we were to take the "[s]tatement of [f]acts" set forth in Haida's memorandum of law in opposition to Asia Pacific's motion to intervene as a pleading, there are no facts in the memorandum that contradict the allegations of the interpleader complaint in a manner that would affect the outcome of the present appeal.

Following oral argument on the motion, the trial court rendered an interlocutory judgment [***12] of interpleader, ordering that the shares be deposited with the clerk of the court on the same day that the order [**247] was entered. In its brief, Haida represents that, following the trial court's judgment of interpleader, Haida and ARC Capital asked for an adjournment of the proceeding before the Grand Court of the Cayman Islands, which was granted, and that, therefore, the public auction never took place. Haida subsequently moved for

318 Conn. 476, *; 122 A.3d 242, **;
2015 Conn. LEXIS 246, ***

reconsideration of the trial court's interlocutory judgment of interpleader. Following oral argument, the trial court denied [*482] that motion. Haida subsequently appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Pursuant to Practice Book §§ 60-2 (1) and 61-10 (b), this court ordered the trial court to articulate the factual basis for its judgment of interpleader. Specifically, this court ordered clarification as to "whether [the trial court] found [that there were claims by] two or more [persons] to the [shares]." The trial court issued an articulation in which it stated that it had "concluded that all of the parties who participated in the interpleader hearing had, and apparently still have, claims to the [shares] [***13] which were and are strong enough to justify the standards of an *interlocutory* judgment of interpleader." (Emphasis in original.) The trial court further clarified that it cannot "make the necessary determinations as to any of the . . . parties, who are at this point in the case at least potentially entitled to some interest in the [shares], until the case is tried on the merits."

Before we address the claims on appeal, we begin by setting forth the general legal principles governing interpleader actions pursuant to § 52-484. "Although interpleader originally derived from common law and equity, in [1893], the legislature adopted 'a broad statutory bill in the nature of interpleader that did not incorporate the traditional equitable restriction[s] [on interpleader]. Except for the addition of a provision for costs and fees and for a few trivial language modifications, this statute remains as Connecticut's interpleader rule.'" *Vincent Metro, LLC v. YAH Realty, LLC*, 297 Conn. 489, 495-96, 1 A.3d 1026 (2010), quoting 2 E. Stephenson, Connecticut Civil Procedure (3d Ed. 2002) § 225 (b). Section 52-484 provides in relevant part: "Whenever any person has, or is alleged to have, any money or other property in his possession which is claimed by two or more persons, either he, or any of [*483] the persons claiming the same, [***14] may bring a complaint in equity, in the nature of a bill of interpleader, to any court which by law has equitable jurisdiction of the parties and amount in controversy, making all persons parties who claim to be entitled to or interested in such money or other property. Such court shall hear and determine all questions which may arise in the case . . . ."

"[I]nterpleader is a broad joinder device to facilitate consolidation of related claims so as to avoid multiple litigation as well as protection against multiple liability . . . ." *Vincent Metro, LLC v. YAH Realty, LLC*, supra, 297 Conn. 496, quoting 2 E. Stephenson, supra, § 225 (a). "The classic interpleader action existing in equity, prior to the enactment of the statute, was brought by a disin-

terested stakeholder to establish the undivided ownership of money or property claimed by two or more entities or individuals. . . . After the passage of the forerunner to § 52-484 in 1893, the rule that an interpleader action be maintained only by a stakeholder with no interest in the disposition of the fund was relaxed." (Citations omitted.) *Millman v. Paige*, 55 Conn. App. 238, 242, 738 A.2d 737 (1999). "Section 52-484 does not preclude an action . . . in [**248] which all claimants, including an interested possessor, as defendants, seek all or a portion of the amount being held by one of the defendants. The equitable purpose of [***15] the statute is to give all those interested or entitled to all or a portion of a fund held by another an opportunity to resolve all questions in a single action." Id., 243; see also *Vincent Metro, LLC v. YAH Realty, LLC*, supra, 497 n.9 (noting that "stakeholders may commence interpleader actions even if they have an interest in the disputed fund").

"Actions pursuant § 52-484 involve two distinct parts . . . ." (Internal quotation marks omitted.) *Vincent Metro, LLC v. YAH Realty, LLC*, supra, 297 Conn. 497; [*484]   see also *Gold v. Rowland*, 296 Conn. 186, 216 n.24, 994 A.2d 106 (2010). In the first part, the court must determine whether the interpleader plaintiff has alleged facts sufficient to establish that "there are adverse claims to the fund or property" at issue. Practice Book § 23-43. If the court considers interpleader to be proper under the circumstances, then the court may render an interlocutory judgment of interpleader. See *Yankee Millwork Sash & Door Co. v. Bienkowski*, 43 Conn. App. 471, 473, 683 A.2d 743 (1996) ("[t]he interlocutory judgment of interpleader determines the propriety of the interpleader procedure"). Only once an interlocutory judgment of interpleader has been rendered may the court hold a trial on the merits, compelling the parties to litigate their respective claims to the disputed property. Practice Book § 23-44.[11]

> 11   Practice Book § 23-44 provides: "No trial on the merits of an interpleader action shall be had until (1) an interlocutory judgment of interpleader shall have [***16] been entered; and (2) all defendants shall have filed statements of claim, been defaulted or filed waivers. Issues shall be closed on the claims as in other cases."

I

As a preliminary matter, we first address the issue of whether Haida has standing to bring the present appeal. Asia Pacific contends that Haida lacks standing to appeal the trial court's interlocutory judgment of interpleader. Specifically, Asia Pacific asserts that, because Haida disclaims all rights to the shares, Haida was not aggrieved by the trial court's interlocutory judgment of in-

terpleader and, therefore, Haida does not have sufficient interest in the matter to pursue this appeal. Haida contends that it has standing to bring this appeal because it was named as a defendant to the interpleader action. We agree with Haida.

"A threshold inquiry of this court upon every appeal presented to it is the question of appellate jurisdiction." [*485] (Internal quotation marks omitted.) *King v. Sultar*, 253 Conn. 429, 434, 754 A.2d 782 (2000). "The right to appeal is purely statutory, and only an aggrieved party may appeal." (Internal quotation marks omitted.) *Perry v. Perry*, 312 Conn. 600, 610, 95 A.3d 500 (2014); see also Practice Book § 61-1. General Statutes § 52-263, which governs the subject matter jurisdiction of this court, provides in relevant part that "if either party is aggrieved [***17] by the decision of the court or judge upon any question or questions of law arising in the trial . . . he may appeal to the court having jurisdiction from the final judgment of the court or of such judge . . . ."[12] "A determination regarding . . . [**249] subject matter jurisdiction is a question of law . . . [and, therefore] our review is plenary." (Internal quotation marks omitted.) *Niro v. Niro*, 314 Conn. 62, 67, 100 A.3d 801 (2014).

12    In the present case, it is undisputed that the trial court's interlocutory judgment of interpleader constitutes an appealable final judgment. See *Vincent Metro, LLC v. YAH Realty, LLC*, supra, 297 Conn. 497.

"It is axiomatic that aggrievement is a basic requirement of standing, just as standing is a fundamental requirement of jurisdiction. . . . There are two general types of aggrievement, namely, classical and statutory; either type will establish standing, and each has its own unique features." (Internal quotation marks omitted.) *Perry v. Perry*, supra, 312 Conn. 620. "Classical aggrievement requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the [controversy], as opposed to a general interest that all members of the community share. . . . Second, the party must also show that the [alleged conduct] has specially and injuriously affected [***18] that specific personal or legal interest." (Internal quotation marks omitted.) Id. "Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to [*486] those who claim injury to an interest protected by that legislation." (Internal quotation marks omitted.) *Soracco v. Williams Scotsman, Inc.*, 292 Conn. 86, 92, 971 A.2d 1 (2009). "Aggrievement is established if there is a *possibility*, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Emphasis added; internal quotation marks

omitted.) *Smith v. Snyder*, 267 Conn. 456, 461, 839 A.2d 589 (2004).

In the present case, Haida does not claim statutory aggrievement; therefore, we consider whether Haida has been classically aggrieved by the trial court's interlocutory judgment of interpleader. Asia Pacific claims that, by contending on appeal that it does not presently have any claim to the shares, Haida has failed to satisfy the test for classical aggrievement because it has no specific personal and legal interest that has been adversely affected.

For purposes of resolving the issue of whether Haida has been aggrieved by the trial court's interlocutory judgment of interpleader, [***19] it is not necessary that this court determine the exact nature of Haida's interest in the subject matter. Haida need only have a "personal and legal interest in the subject matter . . . ." (Internal quotation marks omitted.) *Perry v. Perry*, 312 Conn. 620. Asia Pacific and Vera Financial allege that Haida and ARC Capital are seeking to use the final charging order from the Grand Court of the Cayman Islands to gain full control and ownership over the shares, thereby obtaining full control and ownership of Trikona and gaining the authority to withdraw the underlying complaint. Although, in its appellate brief, Haida disclaims "any possessory interest" in the shares and asserts that "no lien exists," Haida does not dispute that the shares are subject to a charging order in the amount of a judgment previously awarded to Haida and ARC Capital [*487] Court of the Cayman Islands or that the shares may be sold at a public auction in the Cayman Islands in satisfaction of the judgment rendered by that court against Asia Pacific.[13] These undisputed [**250] facts demonstrate that Haida has an interest in the disposition of the shares at the second stage of the interpleader action because of its interest [***20] in having the shares sold at a public auction to satisfy its judgment against Asia Pacific. We conclude, therefore, that as a secured creditor of Asia Pacific by means of the charging order granted by the Grand Court of the Cayman Islands, Haida has a sufficient personal and legal interest in the subject matter of this action to be aggrieved. See *Perry v. Perry*, supra, 620.

13    We note that, although at the trial court's hearing on the motion for reconsideration, Haida asserted that there are not "sharply divergent claims about the [shares]," it never denied the existence of the charging order over the shares. Instead, counsel for Haida stated: "I mean we're not saying that the stock belongs to ARC [Capital] and Haida or . . . Chugh or any of these other entities on our side. . . . What we're saying is that

318 Conn. 476, *; 122 A.3d 242, **;
2015 Conn. LEXIS 246, ***

under the . . . proceedings [before the Grand Court of the Cayman Islands], that [the] shares could soon be put up for public auction, and that this court should not interfere with that."

Moreover, it is sufficient that Asia Pacific and Vera Financial's allegations establish that there is a "possibility" that some legally recognizable interest of Haida's "'has been adversely affected'" by the interlocutory [***21] judgment of interpleader. Smith v. Snyder, supra, 267 Conn. 461. Because the trial court's interlocutory judgment of interpleader has effectively deprived any party of the use of the shares and the ability to exercise any rights over the shares until there is a judicial determination as to each party's rights to the shares, the present case satisfies the standard for classical aggrievement.

We conclude, therefore, that Haida has standing to bring this appeal because the allegations in Asia Pacific and Vera Financial's interpleader complaint, if true, demonstrate that there is a possibility that Haida's [*488] alleged security interest in the shares will be adversely affected.

II

Having concluded that we have appellate jurisdiction, we next consider the merits of Haida's claim on appeal. On appeal, Haida claims that the only entity with an interest in the shares legally recognized under the law of the Cayman Islands is Asia Pacific and that, as a result, the statutory requirement that the property at issue in an interpleader action be "claimed by two or more persons" has not been satisfied. General Statutes § 52-484. Asia Pacific and Vera Financial respond that there are competing claims to the shares. Specifically, Asia Pacific claims that Asia Pacific, [***22] Haida, and ARC Capital have uncontested claims to the shares and that Vera Financial has a "contested claim" to the shares. Vera Financial asserts that it has a claim to the shares because Asia Pacific validly transferred ownership of the shares to Vera Financial as the winding-up proceeding held in the Grand Court of the Cayman Islands was not formally recognized under chapter 15 of the United States Bankruptcy Code. See 11 U.S.C. § 1501 et seq. Vera Financial further claims that Haida and ARC Capital have an ex parte lien over the shares. We conclude that Asia Pacific and Vera Financial have alleged facts sufficient to establish the existence of competing claims to the shares.

Neither this court nor the Appellate Court has established the standard of review for a claim challenging the trial court's interlocutory judgment of interpleader pursuant to § 52-484.[14] Therefore, [**251] in determining the [*489] appropriate standard of review, we turn to a

procedurally similar action--a motion to intervene as a matter of right. See, e.g., Kerrigan v. Commissioner of Public Health, 279 Conn. 447, 456-57, 904 A.2d 137 (2006). "For purposes of judging the satisfaction of [the] conditions [for intervention] we look to the pleadings, that is, to the motion for leave to intervene and to the proposed complaint or defense in intervention, [***23] and . . . we accept the allegations in those pleadings as true. The question on a petition to intervene is whether a well-pleaded defense or claim is asserted. Its merits are not to be determined. . . . Thus, neither testimony nor other evidence is required to justify intervention, and [a] proposed intervenor must allege sufficient facts, through the submitted motion and pleadings, if any, in order to make a showing of his or her right to intervene. The inquiry is whether the claims contained in the motion, if true, establish that the proposed intervenor has a direct and immediate interest that will be affected by the judgment." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 457. Similarly, the question presented at the first stage of an interpleader action is whether there are "conflicting claims to property in the hands of a stakeholder" so as to make interpleader appropriate. Commercial Discount Co. v. Plainfield, 120 Conn. 274, 278-79, 180 A. 311 (1935), citing Grand Lodge v. Burns, 84 Conn. 356, 363, 80 A. 157 (1911). "A complaint in an interpleader action should allege only such facts as show that there are adverse claims to the fund or property and need not, [*490] in fact, should not, allege the basis upon which any claimant relies to justify his claim; the latter allegations are to be made in [***24] the statement of claim following the interlocutory judgment of interpleader." (Emphasis added; internal quotation marks omitted.) Yankee Millwork Sash & Door Co. v. Bienkowski, supra, 43 Conn. App. 473, citing Practice Book (1978-97) § 538 (now § 23-43).

14   Although all parties have asserted in their respective appellate briefs that the applicable standard of review for this interpleader action is abuse of discretion, no party has cited to relevant legal authority for this proposition. Haida cites to First National Bank of Chicago v. Maynard, 75 Conn. App. 355, 815 A.2d 1244 (foreclosure action), cert. denied, 263 Conn. 914, 821 A.2d 768 (2003), and Reynolds v. Giuliani, 506 F.3d 183, 198 (2d Cir. 2007) (discussing applicability of abuse of discretion standard to court's granting of injunctive relief). Both Asia Pacific and Vera Financial incorrectly rely on Driscoll v. Norwich Savings Society, 139 Conn. 346, 93 A.2d 925 (1952), for the proposition that an appellate court reviews a trial court's interlocutory judgment of interpleader for an abuse of discretion. Although Driscoll involved an interpleader action, this

318 Conn. 476, *; 122 A.3d 242, **;
2015 Conn. LEXIS 246, ***

court did not apply the abuse of discretion stand-
ard of review to a trial court's interlocutory
judgment of interpleader in that case, but rather,
this court applied the abuse of discretion standard
to the trial court's award of counsel fees to the
parties' respective personal representatives. Id.,
351-52.

This court has held that "the less restrictive de novo
standard of review is more consistent [***25] with the
nature of the relevant inquiry taken to evaluate [whether
a movant seeking to intervene as a matter of right has
demonstrated a sufficient interest in the subject matter of
the litigation], which is confined to a review of the rele-
vant pleadings, with all allegations therein taken as true"
than the abuse of discretion standard of review. *Kerrigan
v. Commissioner of Public Health,* supra, 279 Conn. 455.
In light of the similarities to granting a motion to inter-
vene as a matter of right, we conclude that the appropri-
ate standard of review for an interlocutory judgment of
interpleader is de novo.[15]

> 15   We further note that Florida's First District
> Court of Appeal has held that the de novo stand-
> ard of review applies to a "trial court's decision to
> grant interpleader . . . ." *Zimmerman v. Cade En-
> terprises, Inc.,* 34 So. 3d 199, 201 (Fla. App.
> 2010).

[**252]   Section 52-484 is "remedial . . . and to be
favorably construed. It requires the court to which any
complaint founded upon it may be brought, to 'hear and
dispose of all questions which may arise in such case,'
and by the provision for making not only all who claim
to be 'entitled to,' but all who claim to be *'interested in,'*
the property in question, parties defendant, shows that its
purpose is to secure a determination of every right, title
or interest that can *by possibility* be set up." [***26] [16]
[*491]   (Emphasis added.) *Union Trust Co. v. Stamford
Trust Co.,* 72 Conn. 86, 93, 43 A. 555 (1899); see also
*United States v. Federative Republic of Brazil,* 748 F.3d
86, 95 (2d Cir. 2014) ("[a]n interpleader suit, by its very
nature, identifies various *possible* claimants to the funds
at issue, but leaves it to the court to decide which, if any,
have a valid claim" [emphasis in original]); 44B Am. Jur.
2d 609, Interpleader § 3 (2007) ("Interpleader statutes are
to be liberally construed. Every reasonable doubt should
be resolved in favor of a putative stakeholder's right to
interplead." [Footnote omitted.]). "It is the express pur-
pose of interpleader actions to avoid duplicative litiga-
tion by resolving all possible questions of liability be-
tween all possible parties in one proceeding. As such,
interpleader actions are especially designed to advance
the interests of wise judicial administration and should
be furthered whenever possible." *Zellen v. Second New
Haven Bank,* 454 F. Supp. 1359, 1365 (D. Conn. 1978);

see also *John Hancock Mutual Life Ins. Co. v. Advance
Realty Co.,* 9 Conn. Supp. 367, 368 (1941) ("[t]he in-
stances will be extremely rare when an interlocutory
judgment will be denied when the plaintiff alleges the
possession of funds to which two or more claim to be
entitled").

> 16   As noted previously in this opinion,
> "[e]xcept for the addition of a provision for costs
> and fees and for a few trivial language modifica-
> tions . . . [the interpleader statute of 1893] re-
> mains as Connecticut's interpleader rule." (Inter-
> nal [***27] quotation marks omitted.) *Vincent
> Metro, LLC v. YAH Realty, LLC,* supra, 297
> Conn. 495-96.

In the present case, although Vera Financial alleges
that it is the "legal and/or equitable owner" of the shares,
Asia Pacific asserts that it continues to own the shares.[17]
Furthermore, Asia Pacific and Vera Financial allege that
the Grand Court of the Cayman Islands awarded Haida
and ARC Capital a judgment against Asia Pacific at the
winding-up proceeding and subsequently granted an ex
parte provisional charging order against the shares in the
amount of the judgment. Asia Pacific alleges that the
Grand Court of the Cayman Islands disregarded the
[*492]   fact that Asia Pacific had existing creditors, in-
cluding a secured creditor, namely, Vera Financial, when
it made the charging order absolute. Haida and ARC
Capital did not deny Asia Pacific and Vera Financial's
allegations regarding the alleged charging order at oral
argument before the trial court. Having reviewed the
facts set forth in the interpleader complaint, we conclude
that Asia Pacific and Vera Financial's allegations are
legally sufficient to support the trial court's interlocutory
judgment of interpleader.

> 17   We note that Vera Financial asserts in its
> appellate brief that it acquired rightful, exclusive
> ownership [***28] of the shares, and that Asia
> Pacific claims in its appellate brief that Vera Fi-
> nancial has a "contested claim" to the shares.

Haida dedicates most of its appellate briefs to con-
testing the merits of each party's purported claim to the
Trikona shares, and its briefs are devoid of any claim that
Asia Pacific and Vera Financial [**253] have failed to
satisfy the pleading standard set forth in Practice Book §
23-43.[18] The crux of Haida's claim on appeal is that, pur-
suant to Cayman Islands law, Asia Pacific is the only
possible legal owner of the shares and that, therefore,
there are no competing claims to the shares that would
warrant the trial court's interlocutory judgment of inter-
pleader, as required under § 52-484. First, Haida alleges
that Cayman Islands law precludes any transfer of shares
in a company after the commencement of a winding-up

318 Conn. 476, *; 122 A.3d 242, **;
2015 Conn. LEXIS 246, ***

proceeding. Thus, Haida claims that Vera Financial can have no claim to the shares under Cayman Islands law because the alleged stock power between Asia Pacific and Vera Financial occurred after the winding-up proceeding held in the Grand Court of the Cayman Islands had commenced. Second, Haida similarly claims that Cayman Islands law precludes Haida's acquisition of the shares without [***29] an order from the Grand Court of the Cayman Islands. Haida argues that, as a result of the charging order against the shares issued by the Grand Court of the Cayman Islands, Haida and ARC Capital issued a summons [*493] for the sale of the shares at a public auction. Haida claims that because any individual or entity, including Asia Pacific and Vera Financial, would have an opportunity to bid on the shares at the public auction and no such auction has yet taken place, Haida does not have a "possessory interest" in the Trikona shares.

18   We note that no party to this action cites to Practice Book § 23-43 in its appellate briefs. Although Haida cites to Practice Book § 23-44 in its brief, it fails to cite to Practice Book § 23-43 in either its initial or reply brief.

To the extent that Haida asserts that this court should consider the merits of the claims alleged in the interpleader complaint to determine their viability under Cayman Islands law, we decline to entertain such an assertion.[19] It was not the role of the trial court, nor is it the function of this court on appeal, to consider the merits of the purportedly competing claims at this preliminary stage of the present interpleader action. See *Vincent Metro, LLC v. YAH Realty, LLC*, supra, 297 Conn. 497. Applying the interpleader standard set forth previously in [***30] this opinion, and considering the liberal construction of § 52-484, we accept the allegations in the interpleader complaint as true and conclude that Asia Pacific and Vera Financial have alleged facts sufficient to establish that Asia Pacific, Vera Financial, Haida, and ARC Capital all have facially competing claims to the shares. See 44B Am. Jur. 2d, supra, § 3, p. 609 ("[i]nterpleader statutes are to be liberally construed"). As the Appellate Court has previously explained, Asia Pacific and Vera Financial have no duty to "allege the basis upon which any claimant relies to justify his claim" before the trial court's interlocutory judgment of interpleader, as the parties will have an opportunity to present such allegations at the second procedural stage of this action in which the merits of their claims are adjudicated. *Yankee Millwork Sash & Door Co. v. Bienkowski*, supra, 43 Conn. App. 473.

19   Similarly, we decline to address Vera Financial's claim concerning the application of chapter 15 of the Bankruptcy Code and any claims relating to the amount of due process afforded in the Cayman Islands proceedings, as these claims speak to the merits of the purported claims and relate to Haida's inadequately briefed international comity claim. See footnote 4 of this opinion.

[*494]   We further rely [***31] upon the trial court's articulation in which it stated that [**254] interpleader was proper under the circumstances because all parties to the interpleader action are "at least potentially entitled to some interest in the stock . . . ."[20] Moreover, insofar as Haida claims that the charging order granted by the Grand Court of the Cayman Islands against the shares does not qualify as a sufficient interest in the Trikona shares for purposes of maintaining an interpleader action, we disagree. As this court explained in *Union Trust Co.*, § 52-484 is broad enough to encompass any "interest that can *by possibility* be set up." (Emphasis added.) *Union Trust Co. v. Stamford Trust Co.*, supra, 72 Conn. 93.

20   We further note that, at the hearing dated December 12, 2015, the following statement was made by the trial court: "I have made nothing resembling a decision as to who's right and who's wrong because . . . we haven't gotten to those issues in the case."

In consideration of the fact that these parties have been involved in multiple proceedings in several jurisdictions; see footnote 5 of this opinion; and that the underlying dispute between the parties is likely to continue until the ownership of the shares and, thus, the ultimate control of Trikona, are determined, it [***32] is in the interest of wise judicial administration to resolve all questions concerning the shares in a single proceeding with all interested parties present. See *Zellen v. Second New Haven Bank*, supra, 454 F. Supp. 1365 (noting that "interpleader actions are especially designed to advance the interests of wise judicial administration").

We conclude that Asia Pacific and Vera Financial have sufficiently stated a cause of action for interpleader, satisfying the pleading requirements as set forth in Practice Book § 23-43. Accordingly, we affirm the trial court's interlocutory judgment of interpleader.

The judgment is affirmed.

In this opinion the other justices concurred.

**Exhibit "7"**

BURNS & LEVINSON LLP

Michael C. Gilleran, Esq.
Direct Dial: (617) 345-3270
eMail: mgilleran@burnslev.com

125 SUMMER STREET  BOSTON, MA 02110
T 617.345.3000  F 617.345.3299
BURNSLEV.COM

*Via Email*

June 1, 2015

Mr. Aashish Kalra
9 Placid Lake Lane
Westport, CT 06880

Re: Notice by Burns & Levinson of Filing of Motions to Withdraw by June 22, 2015

Dear Mr. Kalra:

I am writing to give you notice that Burns & Levinson LLP (the "Firm") will file, no later than June 22, 2015, motions of withdrawal in all matters in which it represents you, Trikona Advisers Limited, and Asia Pacific Ventures Limited (the "Clients") unless payment in full is made to the Firm of all outstanding invoices owed by the Clients to the Firm, or the Clients make other arrangements satisfactory to the Firm that are in writing and signed by both the Clients and the Firm.

For its reasons for this notice of withdrawal, the Firm states:

1. The Clients have an outstanding an unpaid balance due and owing to the Firm from January 2015 through May 4, 2015 of $143,517.24 (the "Outstanding Invoices") (a June-dated invoice for May 2015 time and charges will be issued in the next day or two);

2. The Clients have neither offered nor made any arrangement satisfactory to the Firm for payment of the Firm's Outstanding Invoices; and

3. The Clients have not returned to the Firm a signed copy of the Firm's engagement letter.

If the Clients remove the reasons for the Firm's withdrawal, the Firm will also require an adequate retainer from the Clients equal at least to the next three months' projected billings, or $100,000, whichever amount is greater. This retainer is to be maintained as security for the Firm until all matters being handled by the Firm for the Clients have been completed and final invoices paid in full, upon which event it will be returned to the Clients.

Sincerely yours,
BURNS & LEVINSON, LLP,

Michael C. Gilleran, Partner

MASSACHUSETTS ⫶⫶⫶ NEW YORK ⫶⫶⫶ RHODE ISLAND

Exhibit "8"

## Michael C. Gilleran

| | |
|---|---|
| **From:** | Jeffrey Martin |
| **Sent:** | Thursday, November 19, 2015 11:38 AM |
| **To:** | aashish@kalras.com |
| **Cc:** | Michael C. Gilleran |
| **Subject:** | 2150_001 |
| **Attachments:** | 2150_001.pdf |

Dear Mr. Kalra –

    I am the General Counsel of Burns & Levinson, LLP.  The matter of your unpaid legal bills has now been referred to me for collection.  Attached is a Statement of Account showing a balance due of $342,368.25.

    I understand that you have made numerous promises of payment to Michael Gilleran over the past several months, but no money has ever been paid to our firm.  Based on your repeated assurances of payment, Mike has in good faith worked tirelessly to protect your interests in a number of litigations.  Even though he has now been required to withdraw as your counsel, he has done so in a professionally responsible way so as not to prejudice your interests.  You have willingly accepted all of Mike's good faith efforts, but instead of paying for his services, you have offered nothing but excuses to defer payment.

    Those excuses are not acceptable.  As I trust you can appreciate, it is harmful to our business when clients refuse to make timely payment for our services.  This is especially true when the amount owing is as substantial as the debt you owe to our firm.  We have never agreed to make payment of our bills contingent upon your success in collecting monies owing to you by third parties in India or elsewhere.  We are entitled to be paid immediately, regardless of the outcome of those disputes.

    I am writing to give you one last opportunity to pay us before we begin collection proceedings.  We expect to receive full payment of our bills by no later than Dec. 15, 2015.  If we do not receive full payment by then, we will have no choice but to commence collection proceedings.  We obviously would prefer to avoid that process, so I hope to hear from you shortly with a proposal to satisfy your debt in full.

**Jeffrey R. Martin**
Burns & Levinson LLP
General Counsel
Partner | Business Litigation
125 Summer Street | Boston MA 02110
617.345.3308 (d) | 617.345.3299 (f)
www.burnslev.com
jmartin@burnslev.com

;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;

'Only print this e-mail if necessary.

This e-mail message is intended only for the designated recipient(s).  It may contain confidential or proprietary information, and may be subject to the attorney-client privilege and/or other confidentiality protections.  If you are not the intended recipient, you may not review, retain, disseminate, distribute or copy this communication.  If you have received this communication in error, please notify us immediately by telephone or reply e-mail. Thank you.

1

Exhibit "9"

Cambridge Technology Enterprises Stock Price, Share Price, Live BSE/NSE, Cambridge ...   Page 1 of 4



Cambridge Technology Enterprises Stock Price, Share Price, Live BSE/NSE, Cambridge ...   Page 2 of 4

| Cambridge Tech SENTIMETER | 75% | 25% |
|---|---|---|
| | BUY | SELL |

**75%** of moneycontrol users recommend **buying Cambridge Tech. What's your call on Cambridge Tech today?**
Read investor view

Action in Cambridge Technology Enterprises

Only Sellers
Only Sellers in Cambridge Tech on NSE
Mar 23, 10:03

Only Buyers
Only Buyers in Cambridge Tech on NSE
Mar 22, 10:03

Only Buyers
Only Buyers in Cambridge Tech on NSE
Mar 21, 10:03

Set SMS Alerts on
Cambridge Tech

# The 9 Best Stocks to Own Now

These stock picks come from a handful of the nation's best advisors -- whose recommendations have led to extraordinary profits over the years in stocks, bonds, commodities and precious metals like gold and silver. Don't pay $99 for the names of these stocks. Get them here for free

Consolidated

SPRING CLEARANCE EVENT
2016 CHRYSLER TOWN & COUNTRY $149
BAYSTATE CHRYSLER · JEEP · DODGE · RAM
SHOP NOW!

| Standalone | Consolidated | | |
|---|---|---|---|
| MARKET CAP (RS CR) | 239.50 | EPS (TTM) | 2.15 |
| P/E | 56.74 | P/C | 32.80 |
| BOOK VALUE (RS) | 13.82 | PRICE/BOOK | 8.83 |
| DIV (%) | 0.00% | DIV YIELD (%) | -% |
| MARKET LOT | 1 | FACE VALUE (RS) | 10.00 |
| INDUSTRY P/E | 21.74 | DELIVERABLES (%) | 82.60 new |

* Note - Trailing EPS is displayed only when latest 4 quarter results are available.

Track Cambridge Tech on the go with *moneycontrol* app

iPad · iPhone   Nokia   Android   Android Tab   Blackberry   Windows

EXPAND ALL

GAME CHANGERS   TOP TRADING IDEAS   BUY   Larsen Mar Fut   Entry Price (Rs) 1,227.50   Exit Price (Rs) 1,243.50   Gain (Rs) 16.00   SUBSCRIBE NOW!

Historic Prices & Simple Moving Averages

News/Videos & Announcements

Stock Advice & Research Reports

News Across the Web

Financials

Peers

Share Holding Pattern & Mutual Funds Holding

Company Information

# EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO. _____

———————————————————  )
                                      )
BURNS & LEVINSON, LLP,                )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )
                                      )
AASHISH KALRA,                        )
TRIKONA ADVISERS LIMITED, and         )
ASIA PACIFIC VENTURES LIMITED,        )
                                      )
          Defendants,                 )
                                      )
CAMBRIDGE TECHNOLOGY                  )
ENTERPRISES, LTD.,                    )
                                      )
          Reach and Apply Defendant.  )
———————————————————  )

RECEIVED

APR - 5 2016

SUPERIOR COURT-CIVIL
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

**PLAINTIFF BURNS & LEVINSON'S MOTION FOR
EX PARTE REACH AND APPLY OF STOCK VIA TEMPORARY
RESTRAINING ORDERS AND FOR "FREEZE ORDERS" OF GENERAL ASSETS**

Plaintiff, Burns & Levinson, LLP ("Burns & Levinson"), hereby respectfully moves this

Court for orders, pursuant to Mass. R. Civ. P. 65(a) and G.L. 214, §3(6), of ex parte reach and

apply of stock via temporary restraining orders, and for "freeze orders of general assets, to secure

a debt for legal fees owed by Defendant Aashish Kalra to Plaintiff Burns & Levinson (the

"Motion").[1] Burns & Levinson seeks temporary restraining orders with respect to Mr. Kalra's stock

in Cambridge Technology Enterprises, Inc., of which Mr. Kalra is Chairman as set forth in the

---

[1]   In general, an action to reach and apply is "a method of equity to secure and hold for satisfaction of a judgment
all forms of property that by law may not be attached or take on execution.  In that sense, the reach and apply action
picks up where the legal methods of attachment ... and execution leave off."  J. Shapiro, M. Perlin, and J. Connors,
48 *Massachusetts Practice:  Collection Law*, §11:2 (3d Ed. 2000).

Verified Complaint, ¶¶ 5, 12. The terms requested for these ex parte reach and apply orders against the stock, via temporary restraining orders, are set forth in the Verified Complaint, at Prayers for Relief nos. 3-5. The terms for the "freeze orders" of general assets, which still permit transfers in the ordinary course and for less than $10,000, are set forth in the Verified Complaint, Prayers for Relief nos. 1-2. As grounds in support of this Motion, Burns & Levinson states as follows:

1.     Reasonable Likelihood of Success Is Shown.  Rule 65 of the Mass.R.Civ.P., and case law under G.L. c. 214, § 3(6) (the "Reach and Apply Act"), require that a plaintiff seeking reach and apply must show that it has a reasonable likelihood of success. *Anderson Foreign Motors v. New England Toyota Distributors, Inc.,* 475 F. Supp. 973, 978 (D. Mass. 1979) (where the question was the standard for issuance of a reach and apply injunction that court said, "the central question on the motion for approval of an attachment [actually, reach and apply] is whether the plaintiffs are likely to prevail on the merits and obtain damages in the necessary amount.") Presumably, just as with trustee process under Rule 4.2(c) of the Mass.R.Civ.P., a plaintiff seeking reach and apply must also show that it "will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the trustee process ...."

Here, the basic claim against Defendant Kalra is for unpaid legal services, either by an express contract, by quantum meruit, or by an implied contract. Verified Complaint, Counts I - III. An express contract consists of an agreement on material terms and an intention to be bound. *See Targus Group International, Inc. v. Sherman*, 76 Mass.App.Ct. 421, 428 (2010). The court may also imply terms that are reasonable or that arise from the subsequent course of conduct. *Lawrence v. City of Cambridge*, 422 Mass. 406, 411 (1996). The elements for an express contract are set forth in the Verified Complaint, as follows: Mr. Kalra expressly requested the legal services, and he agreed to pay for the legal services, whether rendered directly to him, or to Trikona, or to Asia Pacific. Verified Complaint, ¶¶ 25, 29. Where Mr. Kalra did not sign the

2

engagement letter specifying the hourly rate, that rate can be derived from the rates set forth in Burns & Levinson's invoices subsequently sent to him, to which rates (or invoices) he never objected, and which were reasonable. Verified Complaint, ¶¶ 30-31.

A claim for quantum meruit is "to recover for services rendered." *Bolen v. Paragon Plastics, Inc.*, 747 F.Supp. 103, 106 (D.Mass. 1990) (Caffrey, J.) A claim for implied contract, or quasi-contract, is for "any type of unjust enrichment." *Id.* "Massachusetts law treats these claims [quantum meruit and implied contract] as having the same common elements." *Id.*; *Broderick v. Lynch*, 87 Mass.App.Ct. 1137, *4 (2015) ("… we analyze the plaintiff's quantum meruit and unjust enrichment claims together."). These common elements are:

> (1) that [she] conferred a measurable benefit upon the defendant[]; (2) that the claimant reasonably expected compensation from the defendant[]; and (3) that the defendant[] accepted the benefit with the knowledge, actual or chargeable, of the claimant's reasonable expectation.

*Broderick*, *3 (2015) (brackets in original). *Finard & Co. v. Sitt Asset Management*, 79 Mass.App.Ct. 226, 229 (2011) (same).

These elements are all set forth in the Verified Complaint, as follows: (i) Burns & Levinson conferred a measurable benefit in that it prosecuted the 2015 Pending Litigations in which Trikona and Asia Pacific were plaintiffs including the Asia Pacific Interpleader Action, and defended the 2015 Pending Litigations in which Mr. Kalra and Trikona were defendants, and also performed services for Mr. Kalra, Trikona, and Asia Pacific consisting of the 2015 Related Services (Verified Complaint, ¶¶ 30-32); (ii) Burns & Levinson reasonably expected compensation from Mr. Kalra in that he expressly engaged Burns & Levinson, he many times promised Burns & Levinson that he personally would compensate it, he communicated frequently with Burns & Levinson as to the legal services he wanted performed, he never objected to Burns & Levinson's invoices, and he had engaged and paid legal counsel many times in the past (Verified Complaint,

3

¶¶ 30-32, 24-29); and (iii) Burns & Levinson performed substantial services benefitting Mr. Kalra, Trikona, and Asia Pacific, Mr. Kalra accepted the benefit of these services with the knowledge of Burns & Levinson's reasonable expectation that it would be paid for such services, he many times promised Burns & Levinson that he personally would compensate it, he communicated frequently with Burns & Levinson as to the legal services he wanted performed, he never objected to Burns & Levinson's invoices, and he had engaged and paid legal counsel many times in the past (Verified Complaint, ¶¶ 30-32, 24-29).[2]

Burns & Levinson has shown the element of a reasonable likelihood of success on the merits of its claims.

2.     Little irreparable harm need be shown. The "central question" on a motion to reach and apply "is whether the plaintiffs are likely to prevail on the merits and obtain damages in the necessary amount." As a result, with motions to reach and apply, which are "in the nature of an equitable attachment," courts "do not require a strong showing of irreparable harm or a favorable balance of harms." *Anderson Foreign Motors,* at 978. The liquidity of the assets sought to be enjoined, and therefore their potential to be disposed of prior to judgment unless enjoined, is more than sufficient to establish the risk of irreparable harm.[3] Here, the stock assets sought to be enjoined are easily transferable: they are negotiable instruments, Verified Complaint, ¶¶ 5, 71, that

---

2 Under Connecticut law, the elements for quantum are similar. *Burns v. Koellmer,* 11 Conn.App. 375, 383-84 (1987) ("the defendant, by knowingly accepting the services of the plaintiff and representing to [it] that [it] would be compensated in the future, impliedly promised to pay [it] for the services rendered."). Likewise, the elements under Connecticut law for unjust enrichment are similar, but not exactly the same. *Gagne v. Vaccaro,* 255 Conn. 390, 408-09 (2001) ("(1) the defendant was benefitted ... (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure to pay was to the plaintiff's detriment."). The elements under Connecticut law for both quantum meruit and unjust enrichment are shown in the Verified Complaint, ¶¶ 30-32, 24-29.

3     Even under the general Massachusetts injunction standard, where the assets sought to be attached might be disposed of prior to a judgment on the merits, irreparable harm has been shown. *General Accident Ins. Co. America v. Bank of New England West, N.A.,* 403 Mass. 473, 475 n. 4 (1988) ("no abuse of discretion in finding irreparable harm where denial of injunction might result in disposal of funds prior to determination on the merits"), citing, *Boston Athletic Ass'n v. International Marathons, Inc.,* 392 Mass. 356, 362 (1984).

4

can be transferred by a mere transfer of possession and endorsement on the negotiable instrument, G.L. c. 106, § 3-201.[4]

3.  Balance Likely to Be Owed at Time of Judgment.  The likely recovery must equal or exceed the amount sought on reach and apply, *Anderson Foreign Motors,* at 978 (court applied the requirement that the amount of likely judgment equal or exceed the value of the asset to be enjoined to a reach and apply action).  The Verified Complaint, at ¶ 67, provides an amount of the judgment Burns & Levinson is likely to recover, nine months from the date of the filing of the Verified Complaint, of $489,265.00.  That total likely recovery of $489,265.00, is based on: (i) the balance of principal now owing for legal services rendered of $ 342,368.25 to be owed under the Counts I-III for contract, quantum meruit, and unjust enrichment; (ii) prejudgment interest at 12% to date (from the date of breach of April 4, 2015, see Verified Complaint, ¶ 33) and to be incurred up to nine months from now (at the time of likely judgment and collection), of $71,897.00, and to be owed under the prejudgment interest statute for contract claims of G.L. c. 231, § 6C; and (iii) legal fees of $75,000 at reasonable rates likely to be incurred over the course of collection up to nine months from now, and to be owed under either G.L. c. 93A or Conn. Gen. Stat. § 42-110 ("CUTPA") for failing to pay from a designated source of payment, *Fraser Engineering Co. v. Desmond,* 26 Mass.App.Ct. 99, 103 (1988) ("the defendant's refusal to carry through on his assurance that plaintiff would be paid from insurance proceeds was both unethical and unscrupulous" and was therefore in violation of 93A), and an award of reasonable attorney's fee under G.L. c. 93A is automatic where a violation is found, G.L. c. 93A, §11, ¶ 6 ("the petitioner

---

[4] G.L. c. 106, § 3-201.  Negotiation. (a) "Negotiation" means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder. (b) Except for negotiation by a remitter, if an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder. If an instrument is payable to bearer, it may be negotiated by transfer of possession alone.

shall ... be awarded reasonable attorneys' fees and costs incurred in said action").[5]   The prejudgment relief sought does not include any amount for multiple damages under 93A or CUTPA for willful or knowing failure to make payment from promised sources of payment. See allegations supporting an award of multiple damages in Verified Complaint, ¶¶ 34, 29, and Counts IV and V.

4.    Prejudgment relief against stock should include an injunctions and turnover orders, as well as limited "freeze orders".   Where prejudgment relief is sought against stock under the Reach and Apply Act, G.L. c. 214, §3(6), and "when a plaintiff in such a suit has obtained temporary injunctions preventing assignment of the property by the defendant debtor, he has acquired an equitable lien upon it, which is good against other creditors ...." *McCarthy v. Rogers*, 295 Mass. 245, 247 (1936).   In addition, a turnover order providing for actual seizure of the stock by a court officer further provides a lien against all parties including purchasers. G.L. 106, § 8-112(a) ("The interest of a debtor in a certificated security may be reached by a creditor only by actual seizure of the security certificate by the officer making the attachment or levy....").   Temporary restraining orders, barring sale, and for turnover, creating a lien, are set forth in the Verified Complaint at Prayers for Relief nos. 3-4.

The "freeze orders" of Mr. Kalra's personal assets, which still permit transfers in the ordinary course and for less than $10,000, sought in the Verified Complaint at Prayers for Relief nos. 1-2, should also be granted to preserve the status quo and to protect the collectability of

---

[5] Because Connecticut also employs the "unethical and unscrupulous" standard for its related CUTPA statute, *Conaway v. Prestia*, 191 Conn. 484, 492-93 (1984) ("whether the conduct is ... immoral, unethical, oppressive, or unscrupulous"), therefore conduct found to be "unethical and unscrupulous" would also violate CUTPA, and CUTPA provides for a discretionary award of attorney's fees, Conn. Gen. Stat. §42-110g ("the court may award ... reasonable attorneys fees").

6

Burns & Levinson's eventual judgment. *See General Accident Ins. Co. America v. Bank of New England West, N.A.*, 403 Mass. 473, 475 n. 4 (1988) ("no abuse of discretion in finding irreparable harm where denial of injunction might result in disposal of funds prior to determination on the merits").

5.   <u>Grounds for Ex Parte Relief Are Shown.</u> Because Plaintiff Burns & Levinson is seeking ex parte reach and apply, in the form of temporary restraining orders, and ex parte "freeze orders," grounds for ex parte relief must be shown. Analogizing to the showing required for a grant of ex parte trustee process under Rule 4.2 of the Mas.R.Civ.P., Rule 4.2(g) permits trustee process to be awarded ex parte as long as one of several grounds for ex parte relief is shown. Specifically, Rule 4.2(g)(ii) provides that trustee process may be granted ex parte where, "there is a clear danger that the defendant if notified in advance of the attachment on trustee process will withdraw the goods or credits from the hands and possession of the trustee and remove them from the state ...." Rule 4.2(g)(iii) also provides that ex parte trustee process may be granted if there is a clear danger that the defendant will "dissipate the credits" (in the trustee process context dealing with bank accounts), which in a more general context means the defendant will transfer or dispose of the assets sought to be enjoined before judgment is rendered and thereby frustrate any likely judgment.

The Verified Complaint sets forth evidence under oath on both these grounds for ex parte relief: (i) Mr. Kalra, despite many promises to date to pay Burns & Levinson, and even promises to pay from specific assets (at least some of which he now has), has not paid or even made any arrangement to pay (Verified Complaint, ¶¶ 29, 34); (ii) Mr. Kalra made no response whatsoever to an November 19, 2015 email from Burns & Levinson's General Counsel demanding payment, offering "one last opportunity to pay", setting a deadline for

7

payment of December 15, 2015, and threatening suit if he did not make payment (Verified Complaint, ¶ 70); (iii) Mr. Kalra is obviously subject to the claims of other creditors including those pending in the 2015 Pending Litigations (Verified Complaint, ¶¶ 22, 24); and (iv) Defendant Mr. Kalra is not physically located in Massachusetts, and has substantial connections in India and elsewhere and could easily transfer the stock to a distant location where it would be extremely difficult to reach after judgment (Verified Complaint, ¶¶ 12 and Ex. "4", 13). The elements necessary for ex parte reach and apply orders against the stock and limited "freeze orders" have been shown.

6.     Lack of Insurance is Shown.   Courts assessing a motion to reach and apply look to whether there is any liability insurance to cover the claim. *Anderson Foreign Motors*, at 978 (court on reach and apply determined that "there is no evidence of liability insurance"). As set forth in the Verified Complaint, at ¶ 68, Plaintiff Burns & Levinson does not believe that the Defendants have any insurance to cover the claims for legal services rendered, or quantum meruit or quasi-contract, or 93A/CUTPA for misrepresentation of intention to pay from designated sources of funds, because Defendants have never mentioned that they have any such insurance, and insurance coverage for legal services rendered or intentional non-payment for such services is not commercially available.

### Conclusion and Relief Requested

For the foregoing reasons, Plaintiff Burns & Levinson requests that its motion for ex parte reach and apply via a temporary restraining orders directed against Mr. Kalra's stock in Cambridge Technology Enterprises, Inc., as well as limited "freeze orders" directed to his general assets, in all respect be allowed. The terms requested for these ex

parte temporary restraining orders are set forth in the Verified Complaint, at Prayers for Relief nos. 1-5.

<div style="margin-left: 50%;">

Respectfully submitted

BURNS & LEVINSON, LLP
By its attorneys,

Jeffrey Martin (BBO No. 322520)
jmartin@burnslev.com
Michael Gilleran (BBO No. 192210)
mgilleran@burnslev.com
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
T: 617.345.3270
F: 617.345.3299

</div>

Dated: April 4, 2016

9

# EXHIBIT C

| SUMMONS AND ORDER OF NOTICE | DOCKET NUMBER<br>1684CV01124 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME:<br>Burns & Levinson LLP vs. Trikona Advisers Limited et al | Michael Joseph Donovan, Clerk of Court |
|---|---|

| To:<br>**Cambridge Technology Enterprises LTD** | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |
|---|---|

To the above named defendant(s):

    You are hereby summoned and required to serve upon:

        **Michael C Gilleran, Esq.**
        **Burns & Levinson LLP**
        **125 Summer Street**
        **Boston, MA 02110**

    an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

    Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application for a Preliminary Injunction has been made in said action, as it appears in the complaint. A hearing on this matter has been scheduled for:

<div align="center">

Date: **04/08/2016**

Time: **02:00 PM**

Event: **Hearing on Preliminary Injunction**

Session Location: **Civil E / BOS-9th FL, CR 916 (SC)**

</div>

at which time you may appear and show cause why such application should not be granted.

| DATE ISSUED<br>04/05/2016 | CHIEF JUSTICE OF THE SUPERIOR COURT<br>Witness:<br>Hon. Judith Fabricant | ASSOCIATE JUSTICE<br>Hon. Peter M Lauriat | ASSISTANT CLERK<br>X<br>(617)788-8175 |
|---|---|---|---|

<div align="center">RETURN OF SERVICE</div>

I hereby certify and return that on _____, I served a copy of this summons, together with a copy of the Complaint.

<div align="center">PARTY NAME:

X</div>

SCV0271 07/2014

DateTime Printed 04-05-2016 16:06:41

# EXHIBIT D

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                              SUPERIOR COURT
                                          CIVIL ACTION NO. _____

                                          16-1124B

---
                                    )
BURNS & LEVINSON, LLP,              )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )
                                    )
AASHISH KALRA,                      )
TRIKONA ADVISERS LIMITED, and       )
ASIA PACIFIC VENTURES LIMITED,      )
                                    )
        Defendants,                 )
                                    )
CAMBRIDGE TECHNOLOGY                )
ENTERPRISES, LTD.,                  )
                                    )
        Reach and Apply Defendant.  )
                                    )
---

## MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

Plaintiff, Burns & Levinson, LLP ("Burns & Levinson"), hereby respectfully moves for an order appointing Professional Process Service of Connecticut, LLC, or its employee or agent, as special process server in the above-captioned case. The person to be appointed special process server is experienced in the service of process, is over the age of eighteen (18) years, and is a disinterested party to this action.

In support of this motion, Plaintiff states that such appointment is necessary to effect expeditious out of state service of Plaintiff's: (i) Verified Complaint, in which it seeks an ex parte reach and apply temporary restraining order; and (ii) Plaintiff's Motion for Ex Parte Reach and Apply of Stock and for Freeze Orders of General Assets. Where such ex parte relief is sought Plaintiff believes that service should be effected out of state as soon as possible, and

1